# IN THE COURT OF APPEALS OF IOWA

No. 20-1689
Filed April 27, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHRISTOPHER WILLIAM THOMPSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Sarah Crane, Judge.


Christopher Thompson appeals his conviction for first-degree murder.
**AFFIRMED.**




Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.



Heard by Bower, C.J., and Schumacher and Ahlers, JJ.

**BOWER, Chief Judge.**

"The fighting issue in this case is whether the defendant acted with premeditation, deliberation, and specific intent to kill."–Prosecutor

Christopher Thompson appeals his conviction for first-degree murder, asserting the trial court erred in admitting hearsay statements made by the deceased. Because the district court did not err in determining the hearsay was admissible under Iowa Rule of Evidence 5.803(3), we affirm.

**I. Background Facts and Proceedings.**

On March 18, 2020, Thompson walked into the Polk County Jail and stated there was a warrant for his arrest. When asked why there would be a warrant, Thompson stated he had killed his mother.

In the meantime, a friend of Thompson's mother had called police to do a welfare check on Paula Thompson[1] because she had not reported for work. Responding officers found Paula dead on the floor of her bedroom.

After being read his *Miranda* rights,[2] Thompson told police interviewers in a recorded statement that he lived with Paula and was occasionally employed by a temp agency. On Friday, March 13, he and Paula were both drunk and arguing. He said when Paula drank she "turn[ed] into a monster."[3] He tried to go into his room, but Paula would not let him shut the door. He stated Paula said his "life is just a pathetic piece of shit and that everything was hers." Thompson "blew up,

---

[1] Because the deceased shares the defendant's last name, we will refer to her as Paula.

[2] *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (requiring police to advise suspects of their constitutional rights before beginning a custodial interrogation).

[3] Thompson also stated Paula was an alcoholic and treated him like her "personal errand boy," making him fetch her more wine, sometimes after he was asleep.

[he] just couldn't take it anymore." He walked down the hallway past Paula, through the kitchen, and grabbed a crowbar from a toolkit in the back staircase. He turned and walked "full stride" back to Paula and struck her in the head. Paula fell to the floor instantly. Thompson struck her in the head several more times, stopping when blood started oozing. He stared at her for a time, walked to the couch, looked at her and then the television, then back at Paula, and noticed blood starting to "go everywhere." He dragged her body into her room, threw a towel over her head, and placed rugs on the blood on the floor so he wouldn't step in it. He then washed the crowbar "because it was dripping" and placed it on the kitchen table.[4]

Thompson told officers he spent the next several days in the house drinking and watching television, leaving twice to buy more alcohol. Lorie Baker tried to contact Paula over the weekend. When Baker could not reach Paula, she contacted Thompson, who told her his mom was on a drinking binge. On March 18, Baker tried several times to reach Thompson. Thompson finally called Baker and told her he couldn't lie anymore, he had killed Paula with a crowbar, and Baker should call police. He turned himself in to police several hours later. Thompson was charged with first-degree murder.

Before trial, the State filed a motion requesting a hearing under Iowa Rule of Evidence 5.104(a) to determine the admissibility of testimony by two witnesses.

> [(1)] Melissa Moylan was a close friend of Paula's. She knew [Thompson] through Paula. While she spent some time with Paula and [Thompson] together, she often spoke with Paula intimately as

---

[4] When his mother's cat crossed his path in the kitchen, Thompson "broke" the cat with the crowbar because he "was still pissed." He threw the cat's body in the trash outside.

well. Paula would confide in her about the nature of her relationship with [Thompson]. Specifically, Paula shared with Moylan that [Thompson] was abusive. In December 2019, Moylan watched a video that was posted to Paula's Facebook page. In the video, Paula whispers that if anything happens to her, it was [Thompson] who killed her. Additionally, approximately one month before Paula's death, Paula confided in Moylan that she and [Thompson] had a heated argument regarding finances. Paula told [Thompson] that she was done supporting him and that he needed to move out of her house. [Thompson] was upset because he didn't want to work. Paula cut up [her] credit cards in front of him. Paula told Moylan that she was afraid of [Thompson]. She said that [Thompson] was drinking again, but she didn't know how he was getting his alcohol without an income.

[(2)] Maggie Wood was [Thompson]'s Probation Parole Officer at the time of his arrest for these offenses. On March 13, 2020 at 5:49 p.m., Paula Thompson emailed Wood. She said, "Maggie, I a tired or being scared[5] . . . he is a drunk. I called the cops and they said to contact you. I need your help I am done. help please." Wood knew that the email came from Paula because Paula had emailed her before about [Thompson].

The prosecutor argued the statements were admissible under Iowa Rule of Evidence 5.803(3) or, in the alternative, rule 5.804(b) as they were not improper character evidence. The defense objected, maintaining the statements were "broad descriptions of character offered by the State, and the statements themselves are hearsay."

The court ruled Paula's statements she was afraid that Thompson might kill her and that she was done supporting Thompson financially and wanted him out of the house were admissible under Iowa Rule of Evidence 5.803(3). The court reserved ruling on additional statements.

At trial, Baker testified about trying to reach Paula on March 17 and 18, sending text and social media messages to Thompson, asking him about Paula,

---

[5] We presume there are typographical errors in this sentence.

and asking that he have Paula call her. Baker testified she missed several calls from Thompson on the morning of March 18. When she finally reached him, Thompson told Baker he and Paula had been fighting. Baker asked if Paula needed to go to the hospital. Thompson then stated, "he couldn't lie anymore, that he had killed her, and he said, 'I killed Mom with a crowbar.'"

Moylan testified she and Paula were close friends, having met in Alcoholics Anonymous. She testified that late at night in December 2019 she viewed a live video of Paula, who was sitting in her living room and "quietly whispering and saying, He's going to kill me; he's going to hurt me; I'm scared; he's going crazy. And she was . . . referencing [Thompson]." Moylan tried to text and call Paula and got no response that night or the next morning, so she called police to do a welfare check. Moylan later received a call from Paula, who was very quiet and whispering. When Moylan asked her what happened, Paula stated, "I can't talk about it" and "I'll tell you later." Paula told her the police had come and she had told them everything was fine.

Moylan also testified she had lunch with Paula in February 2020 and Paula told her she and Thompson had argued about finances. The prosecutor stated, "Please tell us about that" and Moylan responded:

> She was telling me that they had got into an argument because she had told [Thompson] that she was no longer going to take care of him financially, that he needed to work and that he got upset; and she took her credit cards out of her purse and cut them up in front of him and said, This is it and this is proof that this is it, and that made him very angry.

On cross-examination, Moylan acknowledged Paula "struggle[d] with alcoholism" and that when she and Thompson drank together, they argued. She

stated Paula would sometimes go on a drinking binge and Moylan would not hear from her for a few days. Moylan also stated that the night of the live video she heard no yelling or disturbance and Paula did call her the next day and confirmed she was okay.

Maggie Wood testified she had supervised Thompson as his probation officer for seven years. Wood stated she received an email from Paula time stamped 5:49 p.m. on March 13.[6] In the email, Paula stated she was afraid of Thompson, she had called police and the police told Paula to call Wood, and she asked for Wood's help. Wood testified she did not receive the email until March 18 after learning of Paula's death. Wood forwarded the email to police.

Dr. Joshua Akers, the medical examiner, testified Paula sustained several chop wounds[7] to the left temporal scalp, the back of her head, and behind the right ear, which could have been caused by a crowbar. There were also injuries to Paula's right arm and the tip of the right middle finger was "absent." He stated the injuries to the arm and hand could have been received if she had been blocking her head from a blow. There was extensive brain hemorrhaging from trauma to the head. Dr. Akers could not specify the number of strikes Paula sustained. He testified Paula could not have survived her injuries.

Detective Peter Wilson testified he and another detective were assigned to investigate Paula's death and were the officers who interviewed Thompson on

---

[6] Wood stated she had not met Paula but had corresponded by email before and was aware Paula was Thompson's mother.

[7] The coroner explained: "It is so-called a chop wound because it has clean edges that make it look like an edge that would be caused by a sharp implement such as a knife; however, if you look at the edges of the wound, you can see . . . the skin adjacent to the incision is abraded, and it's essentially scraped."

March 18. Detective Wilson testified Thompson was "very cooperative" and admitted killing Paula, breaking Paula's cell phone, and killing the cat.

The defense did not deny Thompson killed Paula but argued the killing was not willful, deliberate, and premeditated—rather, it was an act of passion and provocation. The defense asserted Thompson was guilty of "either voluntary manslaughter or murder in the second degree."

The jury found Thompson guilty of first-degree murder. Thompson appeals, contending the court abused its discretion in admitting hearsay with no relevance to legitimate issues in dispute.

## II. Scope and Standards of Review.

We review Thompson's hearsay claims for errors at law. *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003). "Hearsay . . . must be excluded as evidence at trial unless admitted as an exception or exclusion under the hearsay rule or some other provision." *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006) (alteration in original) (citation omitted); *accord* Iowa R. Evid. 5.802. "Subject to the requirement of relevance, the district court has no discretion to deny the admission of hearsay if it falls within an exception, or to admit it in the absence of a provision providing for admission." *Newell*, 710 N.W.2d at 18. "Inadmissible hearsay is considered to be prejudicial to the nonoffering party unless otherwise established." *Id.*

## III. Discussion.

Hearsay is "a statement that: [t]he declarant does not make while testifying at . . . trial; . . . and [a] party offers into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). There is no dispute Paula's

statements that she feared Thompson would kill her, that they argued about financing, and that she told him she would no longer support him are hearsay.

The district court admitted the statements under rule 5.803(3), which provides an exception to the hearsay rule for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." "The admission of such evidence under this exception is dependent upon the relevancy of the declarant's then existing state of mind, emotion, sensation, or physical condition." *Newell*, 710 N.W.2d at 19.

Thompson argues rule 5.803(3) is not applicable because the "statements were not relevant to any legitimate issue in dispute."

Evidence is relevant if it has any tendency to make any fact of consequence in determining the action more or less probable than it would be without the evidence. Iowa R. Evid. 5.401. Generally, relevant evidence is admissible, and irrelevant evidence is not. Iowa R. Evid. 5.402.

> To prove murder, one of the elements the State had to establish was malice aforethought. Since this element constitutes a state of mind, the prosecutor in murder cases may show prior relations between the parties including incidents of quarrels and physical acts, as bearing on the defendant's quo animo. This rule is firmly established in our law.

*State v. Kellogg*, 263 N.W.2d 539, 542 (Iowa 1978) (internal citation omitted); *accord State v. O'Connell*, 275 N.W.2d 197, 201–02 (Iowa 1979) ("The evidence of quarreling, defendant's hostility, and [a victim]'s fears was also relevant. To prove murder the State had to prove malice aforethought. Because this element

constitutes a state of mind, a prosecutor in a murder case may show prior relations between the accused and the alleged victim, as bearing on accused's quo animo.").[8]

The State asserts the statements were offered because they addressed the element of Thompson's mental state when he committed the crime by providing the factfinder context about the relationship between him and his mother and "fit comfortably within rule 5.803(3)'s exception as explained in *Newell*."

In *Newell*, the defendant challenged admitted testimony including:

> Gillen's estranged husband, Robert Gillen, Jr., testified he heard Newell call Gillen a "dumb f***ing bitch." He also described a phone conversation he had with Gillen just days before her death. Gillen seemed distressed, spoke in whispers, and stated Newell was standing there listening. Robert Gillen spoke with Gillen again on the day she died. Gillen was upset and said she did not want their children to visit that weekend because she had found out something about Newell and was scared. Gillen told her husband she was planning to leave Newell, but she was concerned about the baby. She complained that she was not allowed to go anywhere with the baby alone.

710 N.W.2d at 17.

> The supreme court found these statements admissible:

> Gillen's statements to a number of persons that she was scared of Newell, that she feared for her safety, that she planned to leave Newell, and that she was afraid if she left Newell, he would keep the baby from her were admissible under an exception to the hearsay rule for "then existing mental, emotional, or physical condition." Iowa R. Evid. 5.803(3).

*Id.* at 18. The court found Gillen's emotional state relevant "to rebut the defendant's position that he and the victim had a loving relationship." *Id.* at 19.

---

[8] Quo animo means "With what intention or motive." *Quo animo*, Black's Law Dictionary (11th ed. 2019).

Thompson argues the defense did not assert he and Paula had a loving relationship. His defense was that he acted impulsively out of rage and without a specific intent, premeditation, deliberation, or malice. Thompson's attempt to distinguish this case from *Newell* falls short.

As stated in *Newell*,

> An essential element of first-degree murder is malice aforethought. "Malice aforethought" is defined as "a fixed purpose or design to do some physical harm to another that exists before the act is committed." "Because this element is a state of mind, circumstantial evidence is generally used to prove malice." We have held the prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the time of the crime.

*Id.* at 21 (internal citations omitted).

Looking at the prior relationship between Thompson and his mother, Paula's expressed statements of fear that Thompson was going to kill her in December 2019 and March 2020, and statements Thompson was angry she was withdrawing financial support in February 2020, the evidence rebuts Thompson's defense that his actions on March 13 were impulsive and not premeditated. *See also State v. Wilson*, No. 10-0727, 2011 WL 1584719, at *4 (Iowa Ct. App. Apr. 27, 2011) (finding no error in murder trial in the court admitting statements pursuant to rule 5.803(3) made by decedent to friends about problems she was having with the defendant and her plan to break off her relationship with him, noting "[t]he justification for allowing hearsay statements of a declarant's then existing state of mind is that these 'statements are deemed reliable because of the contemporaneousness of the statement and the physical or mental condition described, and further, because 'the statements do not depend at trial upon the

memory of declarant when external influences may have been brought to bear'" (citation omitted)).

We find the district court did not err in determining rule 5.803(3) applied and the hearsay was thus admissible. We affirm.

**AFFIRMED.**