**STATE of Iowa, Appellee,**

v.

**John Cyril Lapid BUENAVENTURA, Appellant.**

No. 02–0429.

Supreme Court of Iowa.

April 2, 2003.

Linda Del Gallo, State Appellate Defender, and David Arthur Adams, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, Denver D. Dillard, County Attorney, and Russell G. Keast, Assistant County Attorney, for appellee.

TERNUS, Justice.

Appellant, John Buenaventura, a Philippine citizen, was not advised of his right to contact his consulate prior to the police questioning him regarding the beating death of his sister-in-law. In his later prosecution for first-degree murder, the trial court overruled Buenaventura's motion to suppress statements he made during the police interrogation, rejecting a claim that Buenaventura's rights under Article 36 of the Vienna Convention on Consular Relations were violated. The court also refused to allow witnesses to testify as to incidents of vandalism and

harassment suffered by the victim before her death.

On Buenaventura's appeal of his subsequent murder conviction, we affirm the trial court's ruling on the defendant's motion to suppress, as well as the court's refusal to permit testimony regarding prior vexatious acts against the victim. Rejecting the defendant's challenge to the adequacy of the evidence against him, we find sufficient evidence to support the trial court's submission of first and second-degree murder charges to the jury. We preserve Buenaventura's claim of ineffective assistance of counsel for a possible post conviction relief action.

## I. *Background Facts and Proceedings.*

The defendant, John Buenaventura, is a Philippine national who, at the time of the crime, resided in Cedar Rapids, Iowa with his wife, Shirley, and their young daughter. Shirley's sister, Sally Malacas, also lived with them prior to her brutal murder on the evening of March 8, 2001.

The evidence at trial showed that Shirley worked the night shift at a Cedar Rapids nursing home on the night of Malacas's death. While she was gone, neighbors living in the same building were awakened around 2:30 a.m. by the sound of a woman screaming and a man yelling. When Shirley returned home the next morning her sister was not there, even though her purse was in the apartment. Later in the day, when Malacas was still not home, Shirley and friends of the sisters began to look for Malacas. Buenaventura was angry about the search, reminding Shirley that Malacas had run off once before. Rather than joining in the efforts to find Malacas, the defendant rented a carpet cleaner and cleaned the carpets in the apartment where they lived.

Eventually the police were notified that Malacas was missing. Nonetheless, Shirley and others continued to search for her. Finally, on March 11, one of the searchers looked in a utility closet in the apartment building where Malacas lived and discovered Malacas's body. She was fully clothed and was wearing her coat. An autopsy revealed that Malacas had been dead for approximately two and one-half days. She had been brutally beaten, her death caused by severe head injuries. The victim suffered several skull fractures from an unidentified object and extensive injuries to her abdomen and chest, including broken ribs, a punctured lung, internal bleeding and a lacerated liver.

Later that day, the police asked to talk with Buenaventura at the police station. Buenaventura waited in a locked room for four hours while the police interviewed other witnesses. At 8:00 p.m., detectives began their interrogation of the defendant. They first ascertained that Buenaventura understood English. (It is undisputed that Buenaventura can read and understand English even though his native language is Tagalog.) The defendant was given his *Miranda* rights and then he signed a waiver-of-rights form. He did not request an attorney. Although the police knew that Buenaventura was a Philippine citizen, they did not inform him that he had a right to contact the Philippine consulate under the Vienna Convention on Consular Relations.

Buenaventura remained calm during the interview and denied any knowledge relating to Malacas's death. He told the police that he had last seen his sister-in-law prior to taking his wife to work on March 8, 2001. Buenaventura denied cleaning the carpets in his apartment on March 9, until the police informed him that they knew the carpets had been cleaned. The defendant then admitted he had cleaned the carpets, asserting they were stained and he was concerned they would not get their dam-

age deposit back from their landlord. He acknowledged, however, that there was no urgency to this task, as the family had no intention of moving any time soon.

Eventually Buenaventura consented to a polygraph test. After the test was completed, the detectives told Buenaventura that his polygraph examination showed he was providing false information. The defendant stuck to his story, however, and the police prepared to leave the interview room. At this point, Buenaventura asked for an attorney. Rather than providing the defendant with an attorney, the police stopped all questioning and released Buenaventura to go home.

The next contact between the police and Buenaventura occurred at Malacas's funeral. Seeing the detectives on his way into the church, Buenaventura asked the detectives what was going on. After the service, one of the detectives asked the defendant if he wanted to talk to them, but cautioned him that they could not speak to him unless he had an attorney or waived his right to an attorney. Buenaventura agreed to waive his right to counsel and went with the police to the station. The defendant was again given his *Miranda* rights and again signed a waiver-of-rights form that specifically stated he did not wish to have an attorney.

Prior to this second interview, the police had learned that blood and a large amount of detergent had been found in the family vacuum cleaner. In addition, they had discovered that the bottom of the carpet in Malacas's bedroom and the pad beneath the carpet had significant bloodstains. The blood was consistent with that of Malacas.

Buenaventura's second interview began around 9:15 p.m. The detectives focused their questioning on whether the defendant had recently used the family vacuum. Initially, Buenaventura denied ever vacu-

uming. When he was confronted with the information known to the detectives, however, he broke down and began to tell a different story. First he stated he was a cold-blooded killer and that he had killed Malacas with twelve blows to the head with his fists. Then he stated that he used a wooden baseball bat. Almost immediately after these admissions, he returned to his original account that he had not killed his sister-in-law. Buenaventura then asked to talk to the pastor of the church attended by his wife and Malacas.

The pastor arrived around midnight. He agreed to the police listening to his conversation with Buenaventura. The pastor told the defendant that their discussion would not be confidential. During the course of their talk, the pastor advised Buenaventura several times that he should get an attorney. The defendant did not, however, ask for a lawyer.

After talking with the pastor, Buenaventura decided he wanted to give the police a written statement. The defendant's description in this statement of what happened on March 8 varied significantly from any of his prior versions of the events of that evening. Buenaventura said Malacas was at the apartment when he returned home around 11:00 p.m. from dropping off his wife at work. The defendant stated that about 2:30 a.m. he saw two white males walking outside and it looked like they were smoking marijuana. He then invited them into the apartment. Malacas became mad and left. Buenaventura stated he did not know the men or their names. Nor could he describe them because he was high from smoking marijuana. After smoking three marijuana cigarettes, the defendant asked the men to leave and then he went to bed. He said he pushed his bed against his bedroom door so the men would not come back and harm him. Then he went to sleep. He did not

recall whether he locked the apartment door.

Buenaventura claimed he woke up around 4:00 a.m. and checked to see if Malacas was home. It was then that he found a large amount of blood on the carpet in Malacas's room. "Because of the blood [he] knew Malacas was dead and [he] felt it was [his] fault." He tried to clean up the blood with water and detergent. Later in the day he used a vacuum cleaner; eventually he rented a carpet cleaner and further scoured the carpet.

When the police read his statement back to him, Buenaventura became so upset he vomited in the wastebasket. Afterwards, he signed the statement and the police then arrested him for murder. At no time during the interview or prior to his arrest was he informed of any rights under the Vienna Convention. The police did, however, notify the Philippine consulate in Chicago of Buenaventura's arrest, first by voice mail and later by facsimile.

After entering a not guilty plea to the charge of murder in the first degree, Buenaventura filed a motion to suppress the statements he made to the police in their two interviews of him. In addition to claiming that his statements were coerced, he argued they were inadmissible because they had been obtained in violation of his rights under Article 36 of the Vienna Convention. Specifically, he contended he had a right to consular notification and consultation prior to giving any statements to the police. The district court overruled the defendant's motion. Relying on our decision in *State v. Lopez*, 633 N.W.2d 774, 783 (Iowa 2001), the court held that Buenaventura had failed to show that he was actually prejudiced by the failure to notify him of his right to contact his consulate.

The case proceeded to trial and the defendant was found guilty of first-degree murder. In his appeal from that judgment, he raises four issues: (1) the trial court erred in failing to suppress his statements to police because they were obtained in violation of the Vienna Convention and, as a consequence, were not voluntary; (2) there was insufficient evidence of premeditation and malice aforethought to support the court's submission of murder charges to the jury; (3) the court erred in refusing to admit evidence of incidents of vandalism and harassment experienced by the victim in the months prior to her death; and (4) he was denied the effective assistance of counsel because his trial counsel did not adequately investigate the case and failed to file a motion for new trial based on an allegation that the verdict was not supported by the weight of the evidence. We do not think the record is sufficient to permit a decision on the defendant's ineffective-assistance-of-counsel claim, so we preserve that issue for a possible post conviction relief action. *See State v. Speed*, 573 N.W.2d 594, 598 (Iowa 1998). The remaining three issues will be addressed separately.

II. *Ruling on the Defendant's Motion to Suppress: Alleged Violation of the Vienna Convention.*

A. *Scope of review.* The defendant claims his rights under the Vienna Convention were violated and, due to that violation, the waiver of his Fifth Amendment right to counsel was not voluntary. To the extent we are called upon to interpret the Vienna Convention, we review the trial court's ruling de novo. *Lopez*, 633 N.W.2d at 781 (noting federal courts routinely hold that "interpretation or construction of a treaty is subject to de novo review"). Our review of constitutional questions is, likewise, de novo. *State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001).

B. *Treaty provisions.* The Vienna Convention on Consular Relations "is a seventy-nine article, multilateral treaty that governs the establishment of consular relations between nations and defines the functions of a consulate." *United States v. Emuegbunam,* 268 F.3d 377, 388 (6th Cir. 2001), *cert. denied,* 535 U.S. 977, 122 S.Ct. 1450, 152 L.Ed.2d 392 (2002). It was negotiated in 1963 and ratified by the United States in 1969. *Lopez,* 633 N.W.2d at 782. Both the United States and the Philippines are signatories to the treaty. *See State v. Jamison,* 105 Wash.App. 572, 20 P.3d 1010, 1012 (2001). Of the seventy-nine articles of the treaty, only Article 36 arguably protects non-consular individuals. *Emuegbunam,* 268 F.3d at 391. In relevant part, that article states:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

. . . .

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph. . . .

Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, 100–01, 596 U.N.T.S. 261, 292.

■ C. *Propriety of suppression.* Assuming the notification provisions of this article were violated in the matter before us, the State claims any such violation does not require suppression of Buenaventura's statements for two reasons. First, the State argues Article 36 does not create rights that are privately enforceable in the courts. Second, it contends that even if the defendant has an individually enforceable right under the Vienna Convention, suppression of the defendant's statements is unwarranted.

This court has previously declined to determine whether the treaty creates a right that is enforceable by individuals in the courts. *Lopez,* 633 N.W.2d at 783; *Ledezma v. State,* 626 N.W.2d 134, 150 (Iowa 2001). We noted in *Ledezma* that a "majority of courts assume, without deciding, such a right does exist, and then hold the requested remedy is inappropriate or the defendant did not prove he was prejudiced by the alleged Article 36 violation." *Ledezma,* 626 N.W.2d at 151. That is the course we followed in *Lopez,* where we held even if Article 36 did create an individually enforceable right that required suppression of evidence obtained in violation of that right, a defendant would have to show actual prejudice, something the defendant in *Lopez* could not do. *Lopez,* 633 N.W.2d at 783–84.

In the case before us, we again find it unnecessary to decide whether the defendant has rights under the treaty that are enforceable in the courts. But instead of engaging in a prejudice analysis as we did in *Lopez,* we now join those courts that hold the exclusionary rule simply does not apply to evidence obtained in violation of Article 36. *See, e.g., United States v. Minjares–Alvarez,* 264 F.3d 980, 986 (10th Cir. 2001); *United States v. Jimenez–Nava,* 243 F.3d 192, 199–200 (5th Cir.2001); *United States v. Chaparro–Alcantara,* 226 F.3d 616, 621–22 (7th Cir.2000); *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885–86 (9th Cir.2000); *United States v. Li,* 206 F.3d 56, 66 (1st Cir.2000).

The Seventh Circuit Court of Appeals aptly summarized the "basic principles" guiding an analysis of whether suppression is an appropriate remedy in this context:

> Application of the exclusionary rule is only appropriate when the Constitution or a statute requires it. There is no exclusionary rule generally applicable to international law violations. Indeed, the rights protected by the Vienna Convention are equivalent to rights protected by a statute because treaties and statutes have been held by the Supreme Court to be "on the same footing" with each other under the Constitution. Therefore, as in the case of statutes, the exclusionary rule is an appropriate sanction for a violation of a treaty provision only when the treaty provides for that remedy.

*Chaparro–Alcantara,* 226 F.3d at 621 (citations omitted); *accord Minjares–Alvarez,* 264 F.3d at 986; *Jimenez–Nava,* 243 F.3d at 198. Numerous courts examining the Vienna Convention have concluded that it does not provide a remedy of suppression for violations of Article 36. *E.g., Minjares–Alvarez,* 264 F.3d at 986–87; *Chaparro–Alcantara,* 226 F.3d at 621–22; *Lombera–Camorlinga,* 206 F.3d at 886; *Li,* 206 F.3d at 62–63. As one court noted, there is no indication in the treaty that its drafters had the exclusionary rule in mind, "especially given the fact that even the United States Supreme Court did not require Fifth and Sixth Amendment post-arrest warnings until it decided *Miranda* in 1966, three years after the treaty was drafted." *Jimenez–Nava,* 243 F.3d at 198 (quoting *United States v. Page,* 232 F.3d 536, 540–41 (6th Cir.2000)).

We agree with this reasoning. As we noted in *Lopez,* the notification requirements of the Vienna Convention do not involve a fundamental right of the defendant. 633 N.W.2d at 783. Therefore, in the absence of any provision in the treaty itself for suppression of evidence obtained in violation of its provisions, we refuse to create such a remedy.

D. *Impact of violation on voluntariness of statements.* Perhaps in recognition of the growing case law rejecting a suppression remedy, Buenaventura attempts to bootstrap the alleged treaty violation into a constitutional violation. He argues that the denial of his purported rights under Article 36 rendered his statements involuntary under the Fifth Amendment. *See State v. Bowers,* 656 N.W.2d 349, 352 (Iowa 2002) (stating uncounseled responses to interrogation must be "voluntary in fact").

The connection between the treaty violation and the alleged constitutional violation begins with the parties' stipulation that had the Philippine consulate been notified of Buenaventura's detention, it would have advised him to talk to an attorney before giving a statement. The defendant testified that he would have followed this advice. Had he employed an attorney, the reasoning continues, the attorney would have explained to Buenaventura his rights under American law. Buenaventura claims that in the absence of such advice and based on his understanding of police tactics in the Philippines, he feared he would be beaten if he did not confess. He contends, therefore, that his statements were not voluntary.

 The facts do not support this contention. We first note that the voluntary nature of a statement depends on the totality of the circumstances. *See State v. Smith,* 546 N.W.2d 916, 926 (Iowa 1996). Therefore, even assuming Buenaventura's rights under the Vienna Convention were violated, that singular fact would not necessarily render his statements to the police involuntary. The general rule is that "[s]tatements are voluntary if they were

the product of an essentially free and unconstrained choice, made by the defendant whose will was not overborne or whose capacity for self-determination was not critically impaired." *State v. Payton*, 481 N.W.2d 325, 328 (Iowa 1992); *accord State v. Washburne*, 574 N.W.2d 261, 265 (Iowa 1997). Some of the circumstances that are considered in making this assessment include:

> the defendant's age; the level of the defendant's prior experiences with law enforcement; whether the defendant was intoxicated at the time of the statement; whether the defendant was provided *Miranda* warnings; the intellectual capacity of the defendant; whether officers acted in a deceptive manner; whether the defendant appeared to understand and respond to questions; the length of time of the detention and interview; the defendant's physical and emotional reaction to the interrogation; and whether the defendant was subjected to any physical punishment such as the deprivation of food or sleep.

> The Supreme Court has also considered characteristics such as the defendant's age; physical fatigue; mental deficiency; [and] level of education....

*Smith*, 546 N.W.2d at 926 (citations omitted); *accord State v. Vincik*, 398 N.W.2d 788, 790 (Iowa 1987).

■ The record in this case shows that Buenaventura was twenty-six years old at the time of his interrogation. He was college educated, employed in the United States, and understood English. Buenaventura points to no deceptive conduct by the police, nor does he claim they used physical force to coerce statements from him. The first period of questioning began shortly before 8:00 p.m. and was concluded with a polygraph exam administered around 11:30 p.m. The second interrogation a few days later began at 9:15 p.m. and lasted until midnight. Both sessions were interrupted by breaks and the defendant was provided with food and beverages during his questioning. Buenaventura appeared to understand the questions asked and, with the exception of a brief emotional outburst in the second interview, he was generally calm and composed. The police gave Buenaventura *Miranda* warnings on both occasions, and he waived his rights both times. The defendant does not claim the *Miranda* warnings given to him were incomplete or that they were given in an untimely manner. Moreover, he admitted at trial that he understood he could have a lawyer. In fact at the end of the first interview he requested an attorney, but the police chose instead to terminate the interrogation.

We find scant support in these facts for Buenaventura's contention he feared the police and his fear rendered his statements involuntary. Despite the defendant's alleged apprehension that the police would beat him if he did not confess, he persisted in denying he was responsible for Malacas's death. And, despite his failure to confess, he concedes he was not beaten or tortured, nor did the police threaten any physical violence. To the contrary, they gave him food and pop and let him use the bathroom.

Based on our review of the circumstances of Buenaventura's questioning and the relevant factors, we conclude his statements were made voluntarily, a product of his free will, unburdened by coercion. It follows, then, that the defendant's constitutional rights were not violated and, consequently, there is no constitutional basis for suppression of his statements. Accordingly, we affirm the trial court's denial of the defendant's motion to suppress.

III. *Sufficiency of Evidence to Support Submission of Murder Charges.*

At the close of the prosecution's evidence, the defendant moved for a directed verdict of acquittal on the basis the State had failed to prove the defendant acted with malice aforethought and with premeditation as required by the statutes defining murder in the first and second degrees. *See* Iowa Code §§ 707.1, .2, .3 (2001). The court denied the defendant's motion. This ruling has been assigned as error on appeal.

▪▪▪ A. *Scope and principles of review.* We review a court's assessment of the sufficiency of the evidence for correction of errors of law. *See State v. Thomas,* 561 N.W.2d 37, 39 (Iowa 1997). The legal principles governing our review are well established:

The trial court's [or jury's] findings of guilt are binding on appeal if supported by substantial evidence. If a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt, the evidence is substantial. The evidence is reviewed "in the light most favorable to the State, 'including all legitimate inferences and presumptions which may be fairly and reasonably deduced from the ... record.'" We consider all evidence, not just that of an inculpatory nature. Evidence that raises only "suspicion, speculation, or conjecture" is *not* substantial evidence.

*Id.* (citations omitted); *accord State v. Hopkins,* 576 N.W.2d 374, 377 (Iowa 1998).

▪▪▪ B. *Challenged elements of murder charges.* Iowa Code section 707.1 defines murder as the killing of "another person *with malice aforethought* either express or implied." Iowa Code § 707.1 (emphasis added). Buenaventura was charged with two alternative ways of committing murder in the first degree, as defined in section 707.2:

A person commits murder in the first degree when the person commits murder under any of the following circumstances:

1. The person willfully, deliberately, and *with premeditation* kills another person.

2. The person kills another person while participating in a forcible felony [in this case, willful injury].

*Id.* § 707.2(1)-(2) (emphasis added). Insufficient evidence of premeditation would bar submission of the first alternative of the first-degree murder charge. Second-degree murder is simply a "murder which is not murder in the first degree." *Id.* § 707.3. Thus, inadequate evidence of malice aforethought would preclude submission of both first-degree and second-degree murder. We will discuss each challenged element separately.

▪▪▪ C. *Premeditation.* The jury was instructed that premeditate means "to think or ponder upon a matter before acting" and that premeditation need not exist for any particular length of time before the homicidal act. *See State v. Wilkens,* 346 N.W.2d 16, 20 (Iowa 1984). Premeditation may be shown through evidence of (1) activity by the defendant to plan the killing, (2) motive based on the relationship between the defendant and the victim, or (3) the nature of the killing, including the use of a deadly weapon combined with an opportunity to deliberate. *State v. Reeves,* 636 N.W.2d 22, 25 (Iowa 2001); *State v. Khouri,* 503 N.W.2d 393, 395 (Iowa 1993).

▪▪▪ We think there was adequate evidence of motive in the present case to warrant submission of the first-degree murder charge. The evidence showed that Buenaventura did not have a smooth relationship with his sister-in-law. Buenaven-

tura, a Catholic, was quite upset with Shirley and Malacas's involvement with the Baptist church in Cedar Rapids. He was particularly unhappy that Malacas had become romantically involved with the assistant pastor at the church, a situation that frustrated his desire to line up Malacas with a male friend in the Philippines. The tense relationship between Buenaventura and Malacas was not confined to their household as evidenced by the church pastor's testimony that he had questioned Buenaventura during the search for Malacas as to whether he and Malacas had "had a little spat." Finally, there was evidence that Buenaventura had confided to a cellmate "that his sister-in-law used to always be in him and his wife's business."

█ We think the cumulative strength of this evidence would support an inference that the defendant, dissatisfied with Malacas's behavior, choices, and meddling, thought about killing her before undertaking to accomplish that act. The fact that neighbors heard a woman screaming and a man yelling for two to three minutes before the clamor stopped indicates that Buenaventura had an opportunity to think about what he was doing before he struck the murderous blows. As indicated above, the law does not require any minimum amount of time to premeditate and a few minutes are certainly adequate. *See State v. Blair*, 347 N.W.2d 416, 421 (Iowa 1984) ("The amount of time required to bind a person[']s hands and feet is ample to show that an opportunity to deliberate existed.").

Premeditation was also shown by the nature of the crime and the defendant's actions afterwards. As described above, Malacas was brutally beaten. Some of her injuries indicated that she had tried to defend herself from the attack. Buenaventura hid the victim's body and then tried to remove the bloody evidence of the

murder. These circumstances, especially when combined with Buenaventura's ill feelings toward his sister-in-law, indicate that what happened was no accident or defensive reaction by the defendant; it was something Buenaventura thought about before inflicting the fatal blows. *See Wemark v. State*, 602 N.W.2d 810, 817–18 (Iowa 1999) (finding evidence of motive and cover-up activities supported a finding of premeditation). We conclude, therefore, that the trial court did not err in finding sufficient evidence of premeditation to warrant submission of the first-degree murder charge.

█ D. *Malice aforethought.* "Malice aforethought is a fixed purpose or design to do some physical harm to another that exists before the act is committed." *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002). Like premeditation, "[i]t does not have to exist for any particular length of time." *Id.*

█ Because this element is a state of mind, circumstantial evidence is generally used to prove malice. *See State v. Kellogg*, 263 N.W.2d 539, 542 (Iowa 1978). Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought. *Id.* Malice may also be inferred from the use of a deadly weapon. *Reeves*, 636 N.W.2d at 25–26. The record here shows both circumstances: a disharmonious relationship between Buenaventura and Malacas, and the use of a deadly weapon.

█ We have already reviewed the evidence showing the poor relationship between the defendant and the victim that existed before the victim's murder. In addition, autopsy evidence introduced at trial showed that Malacas's fatal head injuries were inflicted with a very hard object having a curved edge. The murderer used

this instrument with "severe force" to inflict five blows to Malacas's head, causing several lacerations to the victim's scalp, as well as multiple skull fractures that resulted in her death. Clearly, the weapon used, though unidentified and never found, was deadly. Moreover, the killer did not stop at bashing in the victim's head; he also beat her body, causing multiple rib fractures, a perforated lung, hemorrhaging around the intestines, and a lacerated liver.

These circumstances provided ample evidence from which a jury could find that the defendant acted with a fixed purpose or design to do physical harm to Malacas. Therefore, the trial court did not err in concluding there was sufficient evidence of malice aforethought to support submission of the murder charges.

IV. *Exclusion of Evidence of Prior Incidents of Harassment and Vandalism.*

In a pretrial motion in limine, the State sought to exclude evidence of (1) "vandalism involving the victim's pickup truck, which occurred five months prior to the homicide"; (2) statements by the victim relating to sexual harassment by co-employees: and (3) "harassing phone calls based on the hearsay statements of the victim." The court granted the motion. It ruled the incidents of vandalism were too remote in time to be relevant and, because they had not been accompanied by threats against the victim, would not assist the jury "in determining who committed the murder." The court refused to allow evidence of the victim's harassment because this evidence consisted of hearsay statements by the victim that did not fall within any exception to the hearsay rule.

The defendant claims the court's ruling was wrong and that it prevented him from presenting his defense—that another person harbored malice toward Malacas and was responsible for her murder. Error was preserved by an offer of proof made by the defendant during trial. *See State v. Lange*, 531 N.W.2d 108, 114 (Iowa 1995).

A. *Scope of review.* We review the court's ruling for an abuse of discretion. *See State v. Ludvigson*, 482 N.W.2d 419, 423 (Iowa 1992). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (citations omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000). Even if an abuse of discretion is found, reversal is not required unless prejudice is shown. *State v. Windsor*, 316 N.W.2d 684, 688 (Iowa 1982). To the extent the defendant's challenge is to the court's ruling that the harassment evidence is inadmissible hearsay, we review for correction of errors of law. *State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000).

B. *Vandalism evidence.* The district court held that the incidents of vandalism to the victim's pickup were too remote in time to be relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. In determining whether an act or event is too remote in time to be relevant, we have said "no precise timetable may be set." *Godbersen v. Miller*, 439 N.W.2d 206, 210 (Iowa 1989). "[T]he question is whether 'the elapsed time is great enough to negative any logical connection between the evidence and the fact sought to be established by it.'" *Id.* (citation omit-

ted); *accord State v. Maestas*, 224 N.W.2d 248, 251 (Iowa 1974). An assessment of remoteness rests in the sound discretion of the trial court. *Maestas*, 224 N.W.2d at 251.

Here, the defendant claimed the incidents of vandalism showed someone else harbored ill will toward the victim and could have been the murderer. The tendency of the proffered evidence to prove this fact was, however, quite weak. The vandalism had stopped several months before Malacas's murder. Although the alleged harassment continued, there was only speculation that the vandalism and harassment were linked. There was no suspect in the vandalism and again only speculation that these prior incidents were connected to the murder.

We conclude the trial court did not abuse its discretion in concluding that the incidents of vandalism did not have the tendency to establish that the victim was murdered by someone other than the defendant. Therefore, the court did not err in excluding this irrelevant evidence. *See* Iowa R. Evid. 5.402 ("Evidence which is not relevant is not admissible.").

C. *Harassment.* This evidence consisted of statements made by Malacas to others concerning allegedly lewd and harassing remarks directed to her at work. In addition, Malacas had confided that the male coworkers making these remarks also initiated unwanted sexual advances toward her. The defendant asserts on appeal that this evidence, like the acts of vandalism, supported his trial defense

> that there was a man associated with Malacas at work who had refused to accept her lack of sexual interest in him, had stalked her, had vandalized her pick-up truck, once violently, and who may very well have met her outside of her apartment and may have talked his

way in or coerced her into admitting him to her room where he ultimately killed her.

The trial court refused to allow the evidence of harassment, holding it was inadmissible hearsay.

Our rules of evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(c). "Hearsay is not admissible except as provided by the Constitution of the state of Iowa, by statute, by the rules of evidence, or by other rules of the Iowa Supreme Court." *Id.* 5.802.

The statements made by Malacas are clearly hearsay and inadmissible unless this evidence falls within some exception to the hearsay rule. The defendant relies on the state-of-mind exception set forth in Iowa Rule of Evidence 5.803(3) for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health). . . . " The defendant argues the victim's alleged statements were "evidence that she had lived in fear of such harassments and had made such statements to others to explain her emotional state." The weakness in this argument is that neither the victim's emotional state nor her state of mind is relevant in this case. The sole purpose and relevancy of this testimony, as the defendant's argument quoted above makes clear, is to prove the incidents of harassment actually occurred, thereby supporting Buenaventura's defense that the person pestering the victim also murdered her. The trial court correctly ruled, however, that Malacas's statements are inadmissible hearsay when offered for this purpose. We find no error in the trial court's ruling.

### V. *Conclusion.*

The trial court did not err in denying the defendant's motion to suppress, as any violation of Article 36 of the Vienna Convention would not warrant exclusion of the evidence obtained as a result of the violation. There was sufficient evidence of premeditation and malice aforethought to support the trial court's submission of the first and second-degree murder charges to the jury. Finally, the trial court did not abuse its discretion or commit error in excluding evidence of prior incidents of vandalism and harassment directed at the victim by persons other than the defendant. We preserve the defendant's claim of ineffective assistance of counsel for a possible post conviction relief action. Finding no basis for reversal, we affirm the defendant's conviction of first-degree murder.

**AFFIRMED.**