# IN THE SUPREME COURT OF IOWA

No. 20–1689

Submitted October 13, 2022—Filed November 18, 2022

**STATE OF IOWA,**

> Appellee,

vs.

**CHRISTOPHER WILLIAM THOMPSON,**

> Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Sarah E. Crane, Judge.

The defendant seeks further review of a court of appeals decision affirming his conviction for first-degree murder, challenging the admission of certain hearsay evidence. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which all participating justices joined. Mansfield, J., filed a concurring opinion, in which Waterman, J., joined. May, J., took no part in the consideration or decision of this case.

Martha Lucey, Appellate Defender, and Theresa R. Wilson (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

"I a[m] tired o[f] being scared . . . he is a drunk. I called the cops and they said to contact you. I need your help I am done." The defendant's mother sent this email to his probation officer hours before the defendant killed her by repeatedly hitting her with a crowbar. At trial, the defendant admitted to killing his mother but argued he was not guilty of first-degree murder because he acted impulsively out of rage. Over the defendant's objection, his probation officer and his mother's friend testified about his mother's fear of the defendant and her plan to stop financially supporting him. The jury found the defendant guilty of first-degree murder.

The defendant appealed, claiming the district court erred in admitting the testimony from the probation officer and his mother's friend as statements of the mother's then-existing mental state under Iowa Rule of Evidence 5.803(3) because her state of mind was not relevant. The court of appeals affirmed. On our review, we agree. The victim's statements were relevant to proving the defendant's intent and motivation at the time of the crime, so the district court correctly admitted them under rule 5.803(3).

### I. Background Facts and Proceedings.

After repeated attempts to get in touch with her friend, Paula Thompson (Paula), Lorie Baker contacted Paula's son, Christopher Thompson (Thompson), who informed her that Paula was not responding to Baker's messages because she was on a drinking binge. Nevertheless, Baker continued her attempts to reach Paula by phone and online messages. After failing to reach Paula for a few

days, Baker called Thompson on March 18, 2020, to inform him that Paula was going to get fired if she did not report to work that day. Thompson replied, "I got into a big argument with my mom. We were both drunk; I blacked out and killed her." He instructed Baker to call the police.

Thompson waited a few hours after speaking to Baker "thinking they'd have a warrant out [for his arrest] by then" before walking into the Polk County Jail and declaring that there was a warrant for his arrest. When asked why there would be a warrant, Thompson stated he had killed his mother. Around the same time, Baker called 911 to do a welfare check on Paula and report what Thompson had said about killing Paula. Responding officers found Paula dead on her bedroom floor.

After the police read Thompson his *Miranda*[1] rights, they conducted a recorded interview with Thompson. Thompson explained the fight that led to Paula's death happened on March 13, around 10 p.m. after they had both been drinking alcohol. According to Thompson,

> When [Paula] drinks, she gets really stupid and starts slamming things and yelling at me, and telling me I'm not doing a good job at life, and that I'm a big mistake, and just always negative. And well, we, the argument got really heated, you know, she got in my face, I got in hers, then it escalated . . . . I hit her in the head with a crowbar and—a few times—and she was on the floor, and she was just laying there, and I didn't know what to do. So, I, I put her back, dragged her into her room, and I closed the door.

Thompson also threw a towel over Paula's head and placed rugs over the blood on the floor to keep from stepping in it.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (holding police must advise suspects of their constitutional rights before a custodial interrogation).

When asked why the fight escalated, Thompson claimed Paula would not let him close his bedroom door and "was in his face." Thompson "just snapped," and he revealed that this was when he walked through the kitchen to get to the back stairway and retrieve the crowbar from the toolset. Upon further questioning, Thompson reported that there was no argument with Paula after he grabbed the crowbar. Rather, he went up to Paula and immediately hit her in the head with the crowbar, causing her to fall down. Thompson proceeded to "hit her a few more times and she stopped moving."

He estimated that he hit Paula "like seven" times. When asked what was going through his mind, Thompson answered, "rage," and explained, "I wanted it to be over." He stated he stopped hitting Paula after he saw all of the blood and realized she was dead, then washed the crowbar in the kitchen sink because it was dripping blood.

After Thompson explained what he did to Paula, the interviewers asked him what happened to Paula's cat. Thompson said he "just got rid of it" because "it wasn't [his] cat." Upon further questioning, Thompson admitted to killing the cat by hitting it with the same crowbar that he used to hit Paula, reasoning he was "still pissed" about everything related to Paula and the cat was hers. Thompson did not believe there was any of the cat's blood on the crowbar and expressed surprise that the cat "just broke" when he hit it. He grabbed the dead cat by the neck and threw it in the garbage can outside. Thompson also smashed Paula's cell phone.

Until he went to the Polk County Jail on March 18, Thompson claimed he only left the house to buy more alcohol after killing Paula and the cat. He told the interviewers that he had initially lied to Baker about Paula being on a drinking binge, but he was having trouble sleeping and felt compelled to admit what he did on March 18. After Thompson's interview, the State charged him with first-degree murder, a class "A" felony, in violation of Iowa Code sections 707.1 and 707.2(1) (2020), as well as animal abuse, an aggravated misdemeanor, in violation of Iowa Code section 717B.2. Thompson separately pleaded guilty to the animal abuse charge.

**A. Pretrial Evidentiary Issues.** Before trial, the State filed a motion requesting a hearing under Iowa Rule of Evidence 5.104(*a*) to determine the admissibility of testimony from two witnesses—Melissa Moylan and Maggie Wood—under either Iowa Rule of Evidence 5.404(*b*) involving prior bad acts or 5.803(3) regarding the declarant's then-existing mental state. Moylan was a close friend of Paula's, and the State sought to admit testimony from Moylan about conversations she had with Paula about Paula and Thompson's relationship.

> Specifically, Paula shared with Moylan that [Thompson] was abusive. In December 2019, Moylan watched a video that was posted to Paula's Facebook page. In the video, Paula whispers that if anything happens to her, it was [Thompson] who killed her. Additionally, approximately one month before Paula's death, Paula confided in Moylan that she and [Thompson] had a heated argument regarding finances. Paula told [Thompson] that she was done supporting him and that he needed to move out of her house. [Thompson] was upset because he didn't want to work. Paula cut up [her] credit cards in front of him. Paula told Moylan that she was afraid of [Thompson]. She said that [Thompson] was drinking again, but she didn't know how he was getting his alcohol without an income.

The State also sought to admit testimony from Wood, Thompson's probation officer at the time of his arrest in this case, regarding an email Paula sent her at 5:49 p.m. on the night she died expressing her fear of Thompson. The email stated, "Maggie, I a[m] tired o[f] being scared . . . he is a drunk. I called the cops and they said to contact you. I need your help I am done. [H]elp please." Wood would also testify that she knew the email came from Paula because Paula had emailed her before about Thompson.

Following a hearing, the district court ruled Paula's statements about being afraid that Thompson might kill her, that she was done financially supporting Thompson, and her desire to get Thompson out of the house were admissible under Iowa Rule of Evidence 5.803(3) as statements of Paula's then-existing mental, emotional, or physical condition. It also allowed the State to introduce testimony from Moylan about Paula's Facebook video under the same rule so long as the evidence that Paula later withdrew the video and told others she was fine was also admitted. The district court reserved ruling on additional statements until trial.

At the final pretrial conference, Thompson again objected to the district court's ruling on the admissibility of the challenged evidence. He also explained that he would make a general objection again at trial to the witnesses' testimony based on the rule 104(*a*) hearing. The district court denied Thompson's renewed objection.

**B. Thompson's Trial.** A jury trial concerning Thompson's first-degree murder charge commenced on November 2. Throughout the trial, Thompson

acknowledged killing Paula, but he argued he was guilty of "either voluntary manslaughter or murder in the second degree" instead of first-degree murder. Namely, Thompson argued he killed his mother as an act of passion and provocation instead of an act that was willful, deliberate, and premeditated. He did not testify.

Baker testified about her attempts to reach Paula and her interactions with Thompson during that time, including Thompson's admission to her that he killed Paula with a crowbar. Moreover, the medical examiner testified about the extent of Paula's injuries and jail staff testified about their interactions with Thompson when he turned himself in at the Polk County Jail. The jury also heard from one of the interviewing detectives and watched the detectives' recorded interview with Thompson, the responding officer's body camera footage discovering Paula's body, and video footage of the crime scene. Similarly, it listened to Baker's 911 call reporting what Thompson told her about killing Paula.

Additionally, the jury heard the challenged testimony from Moylan and Wood. Moylan testified about the Facebook video that Paula had posted late at night in December 2019. She described Paula sitting in her living room and "quietly whispering and saying, He's going to kill me; he's going to hurt me; I'm scared; he's going crazy. And she was . . . referencing [Thompson]." Moylan could not reach Paula by phone or text that night or the next morning, so she called the police to perform a welfare check on Paula. Paula later called Moylan to tell her the police had come and she told them everything was fine. Moylan said

Paula was quiet and whispering on the phone, stating, "I can't talk about it" and "I'll tell you later," when Moylan asked her what happened.

Further, Moylan testified about a conversation she had with Paula over lunch in February 2020, declaring:

> [Paula] was telling me that they had got into an argument because she had told [Thompson] that she was no longer going to take care of him financially, that he needed to work and that he got upset; and she took her credit cards out of her purse and cut them up in front of him and said, [t]his is it and this is proof that this is it, and that made him very angry.

On cross-examination, Moylan admitted Paula "struggle[d] with alcoholism" and argued with Thompson when she and Thompson drank together. She conceded that Paula was known to go on drinking binges when she would not respond to Moylan for a few days. She also acknowledged she did not hear any yelling or disturbance in the Facebook video.

Likewise, the jury heard testimony from Wood about her interactions with Paula as Thompson's probation officer for seven years. Although Wood had never met Paula in person, she had corresponded with her through email before. Wood testified that she received an email time-stamped 5:49 p.m. on March 13, 2020, from Paula declaring she was afraid of Thompson and was asking for Wood's help because the police told Paula to contact her. Wood was off work at the time and did not receive the email until March 18.

The jury found Thompson guilty of first-degree murder. Thompson subsequently filed a motion in arrest of judgment and a motion for new trial, both of which the district court denied. Following sentencing, Thompson filed a timely notice of appeal. We transferred the case to the court of appeals, which

affirmed Thompson's convictions. We granted Thompson's application for further review.

## II. Standard of Review.

We review the district court's evidentiary rulings on hearsay for errors at law. *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021). This is because the district court lacks "discretion to admit hearsay in the absence of a provision providing for it" or deny the admission of hearsay if it falls within an exception. *Id.* (quoting *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020)). We consider inadmissible hearsay to be prejudicial to the nonoffering party "unless the record affirmatively establishes otherwise." *State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) (quoting *State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004)).

## III. Analysis.

Thompson contends the district court erred when it allowed Moylan and Wood to testify under Iowa Rule of Evidence 5.803(3) about previous statements Paula made because they constitute irrelevant hearsay statements.[2] He specifically challenges three different hearsay statements that were admitted at trial: (1) Paula's statements to Moylan and Wood that she was afraid of Thompson, (2) Paula's statements to Moylan that she was going to stop

---

[2]Thompson also discusses whether the challenged evidence was admissible under Iowa Rule of Evidence 5.404(*b*), which governs evidence of prior bad acts. Although the State argued the challenged evidence was admissible under both rule 5.803(3) and 5.404(*b*), the district court resolved the admissibility question under rule 5.803(3) and offered no ruling on the applicability of rule 5.404(*b*). Consequently, we decline to address the applicability of the evidence under 5.404(*b*) on appeal.

financially supporting Thompson, and (3) the statements Paula made in her Facebook video.

"Hearsay is a statement the declarant makes other than while testifying at the current trial that is offered 'to prove the truth of the matter asserted in the statement.'" *State v. Fontenot*, 958 N.W.2d 549, 555 (Iowa 2021) (quoting Iowa R. Evid. 5.801(*c*)(2)). Hearsay is inadmissible unless it falls within an enumerated exception to the law. *Id.* Iowa Rule of Evidence 5.803(3) provides one such exception, allowing the admission of hearsay statements

> of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Nevertheless, the admission of such evidence hinges on its relevance. *Newell*, 710 N.W.2d at 19. Specifically, the evidence must have a tendency to make a consequential fact in determining the action "more or less probable than it would be without the evidence." Iowa R. Evid. 5.401. Thompson maintains the hearsay exception under rule 5.803(3) is inapplicable because the hearsay statements regarding "Paula's state of mind and emotional state were not relevant" to "any legitimate issue." The problem with Thompson's argument is that the statements reveal more than Paula's state of mind, as they also speak to her contentious relationship with Thompson that may have motivated Thompson to kill Paula. "[A] murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of

the victim's relationship to the defendant." *State v. Alston*, 461 S.E.2d 687, 704 (N.C. 1995).

We have reiterated this time and again.[3] For example, we expressed the relevance of these relationships in *State v. Newell*, noting,

> An essential element of first-degree murder is malice aforethought. "Malice aforethought" is defined as "a fixed purpose or design to do some physical harm to another that exists before the act is committed." "Because this element is a state of mind, circumstantial evidence is generally used to prove malice." We have held the prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the time of the crime.

710 N.W.2d at 21 (citations omitted) (quoting *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003)); *see also State v. Richards*, 809 N.W.2d 80, 93 (Iowa 2012) ("Richards' past acts of violence toward Cyd 'reveal[] the emotional relationship between the defendant and the victim and [are] highly probative of the defendant's probable motivation and intent in subsequent situations.' " (alteration in original) (quoting *State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004))); *Buenaventura*, 660 N.W.2d at 49 (holding the acrimonious relationship between the defendant and the victim could be used to support a finding of malice aforethought); *State v. Kellogg*, 263 N.W.2d 539, 542 (Iowa 1978) (concluding hearsay testimony about the defendant and victim's "stormy marriage" was relevant to the defendant's intent to harm the victim).

---

[3]Likewise, "statements by murder victims regarding their plans and feelings[] have been admitted as hearsay exceptions in a number of jurisdictions." *E.g.*, *People v. Fisher*, 537 N.W.2d 577, 581 (Mich. 1995) (discussing cases in various jurisdictions that have admitted this evidence as a hearsay exception).

In that case, Newell was convicted of the first-degree murder of his girlfriend and challenged admitted hearsay evidence that included the victim's "statements to a number of persons that she was scared of Newell, that she feared for her safety, that she planned to leave Newell, and that she was afraid" Newell would keep their baby away from her if she left. *Newell*, 710 N.W.2d at 18. We concluded these statements were admissible under rule 5.803(3)—the same hearsay exception the district court applied in Thompson's case—because the victim's emotional state was relevant "to rebut the defendant's position that he and the victim had a loving relationship." *Id.* at 19; *see also Martinez v. State*, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000) (en banc) ("[The victim's] statement that she was afraid of appellant was a statement of the declarant's then existing state of mind" under Texas Rule of Evidence 803(3)). Thompson seizes on this "loving relationship" language in an attempt to distinguish his case, explaining he admitted killing Paula and "was not claiming that he had a loving relationship with [her] or that she died by accident."

But this is a distinction without a difference. The district court correctly concluded that Paula's statements to Moylan and Wood expressing fear of Thompson and her statements to Moylan that she was done financially supporting Thompson are comparable to the challenged statements in *Newell*. As the district court reasoned, Paula's statements to Moylan about her plan to stop supporting Thompson financially and that he needed to move out are

> virtually identical to someone's plan to leave their spouse. She's saying, I'm planning -- whether you're going to be the one leaving the house or whether you're making the other person leave the house, it's the plan to separate in the relationship. And she makes

a similar statement to [Wood] that -- the statement that she called the cop; "They said to contact you; I need your help; I am done; please help, please" also falls within that plan category.

*See, e.g., State v. Wood*, 881 P.2d 1158, 1167–68 (Ariz. 1994) (en banc) ("The statements about [the victim's] fear and desire to end the relationship helped explain Defendant's motive. The disputed trial issues were Defendant's *motive* and *mental state*—whether Defendant acted with premeditation or as a result of a sudden impulse. The prosecution theorized that Defendant was motivated by anger or spite engendered by [the victim's] termination of the relationship. [The victim's] statements were relevant because they showed her intent to end the relationship, which in turn provided a plausible motive for premeditated murder." (footnote omitted)); *State v. O'Neal*, 721 N.E.2d 73, 84–85 (Ohio 2000) (holding the victim's statements that she was afraid of the defendant—her husband—and planned to separate and end the marriage were admissible at the defendant's aggravated murder trial as evidence of the victim's then-existing state of mind).

Moreover, Thompson's attempt to distinguish his case from *Newell* based on the "loving relationship" language overlooks the portion of *Newell* that is directly on point here. *Newell*, 710 N.W.2d at 21–22. Namely, "If Newell and [the victim] had an acrimonious relationship, it is more probable that Newell acted with malice—a fixed purpose to do harm—at the time of [the victim's] death than if they had a loving relationship." *Id.*; *see also Taylor*, 689 N.W.2d at 128 ("[I]f the defendant was angry with his wife and hostile toward her, then it would be more likely that he was aggressive and threatening when he found her in the

church parking lot. His anger and hostility make it more probable that he intended to break out the van window so he could forcibly remove his wife from the vehicle . . . ."). Here, the dispositive issue at trial was whether Thompson acted with malice aforethought. Paula's statements expressing her fear of Thompson and her plan to withdraw financial support were probative of her relationship with Thompson and his possible motive for harming Paula. *See Richards*, 809 N.W.2d at 95 ("Cyd's out-of-court statements to Furman and her daughter that she was afraid of Richards and wanted to find somewhere else to live were admissible under the hearsay rule exception for statements relating to a '[t]hen existing mental, emotional, or physical condition.' " (quoting Iowa R. Evid. 5.803(3))); *Newell*, 710 N.W.2d at 22. Similarly, they rebut Thompson's defense that he killed Paula impulsively out of rage without premeditation.

Further, like the challenged testimony in *Newell* and *State v. Richards*, the testimony about Paula's fear of Thompson was interwoven with admissible direct evidence demonstrating the nature of their relationship. Perhaps most significant of all was Thompson's recorded interview with detectives confessing to killing Paula, which the jury was shown. Like the challenged testimony, Thompson made various statements in the interview that easily allowed the jury to conclude that Thompson's contentious relationship with Paula provided a motive to kill her. For instance, he made multiple statements throughout the interview about how mean Paula could be to him and admitted to arguing with her every time she drank. Thompson stated that Paula would regularly "get[] really stupid and start[] slamming things and yelling at me" when she drank

alcohol. Similar to the resentment Paula expressed to Moylan over financially supporting Thompson, Thompson told detectives that Paula was ranting about everything in the house being hers, including his clothes and the bedroom door he was trying to close soon before he killed her.

Moreover, Thompson complained to the detectives about having to be Paula's "personal errand boy," detailing a time Paula sent him to the grocery store to get more wine at around "11 o'clock at night . . . I was like, are you kidding me? I was asleep." He even admitted to killing Paula's cat because it belonged to Paula, and he "was still pissed" at "[e]verything about mom, everything she -- everything was hers." Overall, the jury was not without direct evidence from Thompson himself concerning the nature of his relationship with Paula.

"[C]ourts have had little difficulty admitting evidence of a murder victim's fear of the accused when the victim's fear was relevant to a material issue other than 'the happening of the event which produced the state of mind.'" *Linton v. State*, 880 P.2d 123, 130 (Alaska Ct. App. 1994). That is the case here, as the disputed evidence relating to Paula's fear of Thompson was not used to prove that Thompson had in fact previously done something to Paula to make her afraid of him. Rather, this evidence suggests a plausible motive for Thompson's commission of the crime: that Thompson resorted to murder after Paula made it clear that he needed to move out and that she would no longer financially support him. *See id.* at 131; *see also Re v. State*, 540 A.2d 423, 430 (Del. 1988) (holding the victim's statement to a friend that the defendant had threatened to

kill the victim and believed he would not be found guilty as long as he acted crazy were admissible as evidence of the victim's state of mind, namely her "fear that [the defendant] would kill her," which was "contrary to [the defendant's] position that [the victim] incited stress in him which ultimately led him to kill her"); *Moore v. State*, 761 P.2d 866, 870 (Okla. Crim. App. 1988) ("Much of [the state of mind] testimony reflected Mrs. Moore's fear of her husband and that he could harm her. Such antecedent declarations by a decedent are admissible in a case of homicide to show the decedent's state of mind toward the defendant as well as providing a motive for the killing.").

Evidence of Paula and Thompson's "acrimonious relationship" makes it "more probable that [Thompson] acted with malice—a fixed purpose to do harm—at the time of [Paula's] death than if they had a loving relationship." *Newell*, 710 N.W.2d at 21. Consequently, "this evidence was essential to the truth-seeking function of the jury." *Id.* at 23. To hold otherwise would result in a significant departure from well-established Iowa precedent and require us to overturn *Newell* and other cases that have relied on its reasoning. Thompson does not offer a persuasive argument to justify such a drastic change.

We also reject Thompson's comparison of the challenged statements to the victim's statements that we deemed inadmissible in *State v. Buenaventura*, 660 N.W.2d 38. There, the defendant sought to offer evidence that the murdered victim told others that a man she was associated with at work

> had refused to accept her lack of sexual interest in him, had stalked
> her, had vandalized her pick-up truck, once violently, and who may
> very well have met her outside of her apartment and may have talked

his way in or coerced her into admitting him to her room where he ultimately killed her.

*Id.* at 51. Notably, the defendant sought to admit these statements to support his defense that this man at work murdered the victim instead of the defendant. *Id.* Consequently, we concluded the hearsay evidence was inadmissible because the victim's then-existing state of mind was not relevant when offered to introduce the defense's theory that the third party was actually responsible for the murder. *Id.*

This situation is not comparable because Thompson admitted to killing his mother and has never claimed otherwise. As the State simply put it in the hearing on this evidence, "[T]he nature and the history of the relationship between a man and his mother is relevant in a trial where the man is accused of killing his mother." That includes "bad feelings, quarrels, and physical acts" between them, which "may be shown to prove the defendant's state of mind and motivation at the time of the crime." *Newell*, 710 N.W.2d at 21. Accordingly, Thompson's relationship with his mother was relevant in deciding whether he acted with malice aforethought regardless of his acknowledgment that they did not have a loving relationship.

Thompson poses an additional relevance argument concerning Moylan's testimony about Paula's Facebook video, asserting this testimony was not relevant because Paula posted the video three months before her death. But the passage of time makes no difference here because Paula's statements that she was afraid of Thompson in the video were part of her ongoing fear that Thompson would harm her. *Cf. Richards*, 809 N.W.2d at 93 ("We believe the evidence that

Richards physically abused Cyd during the year before her death was relevant and probative."); *State v. Gogg*, 561 N.W.2d 360, 367 (Iowa 1997) (explaining that the passage of time between an informant's observations and the issuance of a warrant is "less problematic" when the information shows ongoing activities "because it is more likely that these activities will continue for some time into the future"). Her other, more recent statements to Moylan and Wood corroborate that ongoing fear, including the email she sent to Wood hours before Thompson killed her expressing this fear.

Ultimately, all of the evidence that Thompson challenges was highly relevant because it was pertinent to his possible motive for killing Paula. Therefore, the district court correctly concluded it was admissible under Iowa Rule of Evidence 5.803(3).

**IV. Conclusion.**

For the reasons discussed above, we affirm Thompson's conviction.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except May, J., who takes no part. Mansfield, J., files a concurring opinion, in which Waterman, J., joins.

**MANSFIELD, Justice (concurring).**

I join the court's well-written opinion.

I write separately to express my misgivings about admitting a victim's prior out-of-court statements under the Iowa Rule of Evidence 5.803(3) state-of-mind exception, when the purpose is not actually to prove the victim's state of mind but to raise an inference as to *what the defendant must have done to bring about that state of mind.*

The district court allowed witnesses to testify to Paula's out-of-court statements that she was scared of Thompson, that she had contacted police, that she had cut up her credit cards in front of Thompson making him angry, that she had a heated argument with Thompson, and that she had told Thompson she was no longer going to support him. All of this evidence was hearsay.

Notably, some of these out-of-court statements involve Paula's reports of things she had said or done—for example, that she had contacted the police or cut up her credit cards and made Thompson angry. These do not seem to fall under any hearsay exception, and nobody has cited an applicable hearsay exception. In the ordinary course of events, they would be inadmissible hearsay.

Other statements might potentially be admissible under the rule 5.803(3) hearsay exception for "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." *Id.* For example, assuming that Paula's fears of Thompson were directly relevant to an issue in the case, evidence

that she told people she feared him would be admissible. A victim's previous fear of the defendant would be relevant, for example, if consent were an issue in the case.

I question whether Paula's fear, standing alone, is relevant in this case. Rather, her fear is relevant only to the extent it suggests that Thompson had done or said things to make her afraid. That's a hearsay inference. It is as if Paula said, "I'm afraid of Thompson because he has done things that make me frightened." It engenders the same "backdoor hearsay" problem we have discussed in the past, where evidence that appears on its face not to be inadmissible hearsay is used so that jurors will draw an improper hearsay inference. *See, e.g., State v. Huser*, 894 N.W.2d 472, 493–97 (Iowa 2017) (discussing this issue).

McCormick on Evidence summarizes the issue well:

> A recurring problem arises in connection with the admissibility of accusatory statements made before the act by the victims of homicide. If the statement is merely an expression of fear, such as, "I am afraid of D," no hearsay problem is involved, since the statement falls within the hearsay exception for statements of mental or emotional condition. This does not, however, resolve the question of admissibility. The victim's emotional state must relate to some legitimate issue in the case. For example, the victim's emotional state may permit the inference of some fact of consequence, such as lack of consent where the prosecution charges that the killing occurred during the commission of either a kidnapping or rape.

> However, the most likely inference that jurors may draw from the existence of fear, and often the only logical inference that could be drawn, is that some conduct of the defendant, probably mistreatment or threats, occurred and caused the fear. The possibility of over-persuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance.

> Moreover, even if the judgment is made that evidence of fear standing alone should be admitted, statements of fear are rarely stated pristinely. Instead, that state of mind usually assumes the form either of a statement by the victim that the accused has made threats, from which fear may be inferred, or perhaps more likely a statement of fear because of the defendant's threats. Not only does the evidence possess the weaknesses suggested above for expressions of fear standing alone, but in addition it seems unlikely that juries can resist using the evidence for forbidden purposes in the presence of specific disclosure of misconduct of the defendant.

> In either event, the cases have generally excluded the evidence.

2 Kenneth S. Broun et al., *McCormick on Evidence* § 276, at 426–28 (Robert P. Mosteller ed., 8th ed. 2020) (footnotes omitted) [hereinafter Broun]; *see also United States v. Brown*, 490 F.2d 758, 766 (D.C. Cir. 1973) ("The principal danger [of admitting such statements] is that the jury will consider the victim's statement of fear as somehow reflecting on defendant's state of mind rather than the victim's—*i.e.*, as a true indication of defendant's intentions, actions, or culpability."); 7 Michael A. Graham, *Handbook of Federal Evidence* § 803:3, at 195 (9th ed. 2020) ("An important limitation, however, is that the mental or emotional condition sought to be shown, 'such as fear, must be relevant other than to prove the events giving rise to the fear.'" (quoting 2 Broun § 274, at 411 n.20)); Lynn McLain, *"I'm Going to Dinner with Frank": Admissibility of Nontestimonial Statements of Intent to Prove the Actions of Someone Other Than the Speaker—and the Role of the Due Process Clause*, 32 Cardozo L. Rev. 373, 394 (2010) ("In the typical homicide case, for example, the victim's state of mind and her own subsequent acts are usually irrelevant. What is in question, rather, is only the defendant's conduct: Did the defendant murder her? Her statement,

"I'm afraid of Defendant," though it describes her state of mind, would ordinarily be relevant only to prove that the defendant had done something in the past to put the victim in fear, which in turn would make it more likely that he had hurt her this time as well. It thus would be offered for a 'backward-looking' initial purpose and would be inadmissible under Shepard, as codified in Rule 803(3)." (footnotes omitted)).

In *State v. Nance,* we adopted the McCormick line of reasoning in holding that a victim's out-of-court statements that she feared the defendant should not have been admitted in a murder trial. 533 N.W.2d 557, 561 (Iowa 1995). As we explained,

> Although it may be "state of mind" evidence, it was inadmissible because the probative value of the evidence did not substantially outweigh the danger of unfair prejudice. Iowa R. Evid. 403. The admission of Powell's testimony about [the victim's] statement of fear was prejudicial error.

*Id.* We also quoted from *United States v. Brown* with approval. *Id.* at 559–60. Ultimately, we reversed the defendant's conviction and remanded for a new trial even though the statements were made by the victim only "twelve to fourteen hours before she was shot" and even though the state had argued—and the district court agreed—that they were admissible "to contradict prior testimony of a close and kind relationship between the victim and the defendant." *Id.*

But *Nance* is not our last word on the subject. Closer in time are our 2006 and 2012 opinions in *State v. Newell*, 710 N.W.2d 6 (Iowa 2006), and *State v. Richards*, 809 N.W.2d 80 (Iowa 2012). In *Newell*, we held that a murder victim's statements that she was scared of the defendant and feared for her safety were

admissible under the rule 5.803(3) exception because "[the victim's] emotional state was relevant in this case to rebut the defendant's position that he and the victim had a loving relationship." 710 N.W.2d at 19. In *Richards*, we likewise held that a murder victim's out-of-court statements "that she was afraid of [the defendant] and wanted to find somewhere else to live" were admissible under rule 5.803(3). 809 N.W.2d at 95 (citing *Newell*, 710 N.W.2d at 18–19). These opinions do not mention *Nance*, but they reflect the current state of the law in Iowa.

In *Newell* and *Richards*, the relationship between the defendant and the victim was largely proved by direct evidence. Any testimony that the victim feared the defendant was interwoven with lots of clearly admissible evidence about the defendant's prior abusive behavior toward the victim. *See Newell*, 710 N.W.2d at 19 ("[T]he fact that the couple was not getting along could be easily gleaned from the admissible testimony."); *Richards*, 809 N.W.2d at 95 ("There was plenty of nonhearsay evidence that [the defendant] abused [the victim]."). Here, as the court's opinion ably demonstrates, there was likewise considerable nonhearsay evidence concerning the relationship between Thompson and Paula. The hearsay bolstered a case regarding the parties' prior relationship developed mostly through nonhearsay, principally Thompson's interview. So I think this case is governed by *Newell* and *Richards*.[4]

---

[4]I note that the court's opinion has a series of quotations from out-of-state cases. I'd be wary of putting too much stock in those quotations. There is also a lot of out-of-state authority supporting the McCormick position. *See* Jay M. Zitter, Annotation, *Admissibility of Evidence of Declarant's Then-Existing Mental, Emotional, or Physical Condition, Under Rule 803(3) of Uniform Rules of Evidence and Similar Formulations*, 57 A.L.R.5th 141, § 3[b] (1998); *see also* Gordon Van

Having said that, I would exercise caution in admitting prior statements of a decedent in a murder case. Each statement, and the reasons for which its admission is sought, should be examined separately and carefully.

Waterman, J., joins this concurrence.

---

Kessel, *Hearsay Hazards in the American Criminal Trial: An Adversary-Oriented Approach,* 49 Hastings L.J. 477, 537 n.250 (1998) (characterizing *United States v. Brown* as representing "the majority view").