# IN THE COURT OF APPEALS OF IOWA

No. 21-0075
Filed January 25, 2023

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**JORDAN CHRISTOPHER HENRY,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Woodbury County, Steven J. Andreasen, Judge.


      Jordan Henry appeals his conviction for second-degree murder. **AFFIRMED.**


      Jennifer Bennett Finn of Pelzer Law Firm, LLC, Estherville, for appellant.

      Brenna Bird, Attorney General, and Israel Kodiaga, Assistant Attorney General, for appellee.


      Considered by Bower, C.J., and Greer and Badding, JJ.

**BOWER, Chief Judge.**

Christopher Henry was criminally charged after he set fire in a hotel room and Elizabeth Bockholt's body was found in the room. Following a bench trial, Henry was convicted of second-degree murder and first-degree arson. On appeal, Henry challenges only his conviction for second-degree murder and contends there is insufficient evidence of malice aforethought to support the conviction, his constitutional right to present a defense was violated when the district court ruled he could not rely on "methamphetamine-induced psychosis" as a complete defense, the evidence established he was insane as a result of his voluntary intoxication, and resentencing is needed because the court's statements were ambiguous. Finding no merit in any of his claims and a clear intent to impose consecutive sentences, we affirm.

**I. Sufficiency of the Evidence.**

Henry asserts there is insufficient evidence of malice aforethought to support the second-degree murder conviction. We review Henry's sufficiency-of-the-evidence challenge for legal error. *See State v. Lacey*, 968 N.W.2d 792, 800 (Iowa 2021). Our sufficiency review is the same for a bench trial as a jury trial. *State v. Myers*, 924 N.W.2d 823, 826 (Iowa 2019). The court's findings of fact have the effect of a special verdict and are binding on appeal if supported by substantial evidence. Iowa R. App. P. 6.907; *Myers*, 924 N.W.2d at 826. "Evidence is substantial when the quantum and quality of evidence is sufficient to 'convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.'" *Lacey*, 968 N.W.2d at 800 (citation omitted). We "consider[] the evidence

in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.*

In a fifty-two page detailed and comprehensive ruling, the trial court made these findings and conclusions relevant to the finding of guilt on second-degree murder.

### 1. Strangulation

It essentially is not disputed that the circumstances in this matter occurred in Woodbury County on or about January 24, 2019. The Wingate Hotel was located in Sioux City, Woodbury County, Iowa. The testimony of the witnesses and the 911 call records from the hotel all establish that Bockholt was alive in the morning of January 24 and was pronounced dead at the hospital in the late hours that same day. Her body was found by the firefighters around 9:30 p.m. The questions are whether the State proved beyond a reasonable doubt that Bockholt was strangled and, if so, that Henry strangled her.

In this regard, the court finds and concludes that the State has proven beyond a reasonable doubt that Henry strangled Bockholt on or about January 24, 2019, in Woodbury County, Iowa.

For reasons discussed in more detail in regard to causation under Element 2 below, the court finds the testimony of Pathologist [Jonathan] Thompson regarding strangulation to be credible. The abrasions, bruising, and ligature marks noted externally on Bockholt's neck are consistent with strangulation and the application of force to her neck. The internal or subcutaneous hemorrhaging found in the muscles and other soft tissue in the neck were also consistent with and further established such strangulation, considering the force applied to Bockholt's neck required to cause such internal trauma.

Although the court agrees with Henry that there were no direct eyewitnesses who saw Henry strangle Bockholt, the circumstantial evidence presented at trial in this regard was overwhelming and beyond a reasonable doubt. Henry checked into Room 102 of the hotel through [his aunt, Sherry] Jones during the evening of January 23. He was still in Room 102 at around 11:30 a.m. when Jones spoke to him on the phone. He then exited Room 102 just after 9:21 p.m. when [Brenda] Chaffin and Phil Bockholt knocked on the door. Bockholt was dropped off at Room 102 by Chaffin in the morning of January 24. Approximately two hours after Bockholt was dropped off, a female answered Jones' call to Room 102 of the hotel. Bockholt then called [Staci] Hansen from the Wingate Hotel during the afternoon, with the last call around 5:44 p.m. Finally, Bockholt's

body was found inside Room 102 by the firefighters within minutes after Henry left the room and the hotel. No other persons were located inside Room 102 from the time Chaffin and Phil Bockholt arrived until Bockholt's body was discovered. The desk clerk . . . at the hotel also saw no disturbance or any person believed to be Bockholt in the hallways and common areas of the hotel when Hansen called looking for her.

Bockholt and Henry, therefore, were the only two people in Room 102 in the morning of the 24th and were the only two people in Room 102 later that night when Henry left the room and the hotel and Bockholt's body was discovered. Bockholt was alive and at the hotel in the afternoon when she called Hansen from the hotel but was not seen in any common areas of the hotel by the desk manager when Hansen called looking for her. There otherwise was no evidence that other persons entered Room 102 during the evening of January 24 before Bockholt's body was discovered.

. . . . The "window" of time when the strangulation occurred would have been between 5:44 [p.m.] when Bockholt last called Hansen and sometime prior to approximately 9:20 [p.m.] when Chaffin and Phil Bockholt knocked on the door to Room 102. The circumstantial evidence submitted at trial establishes beyond a reasonable doubt that Bockholt and Henry were the only persons in Room 102 during that time. . . .

## 2. Cause of Death

The court finds and concludes that the State has proven beyond a reasonable doubt that Bockholt died as a result of the strangulation. In reaching this finding and conclusion, the court initially finds the testimony of Pathologist Thompson to be credible. The court considers his education and experience, the reasons he gave for his opinion and conclusions regarding cause of death, and all other evidence in this case. The court finds his testimony and conclusions concerning cause of death to be reasonable and consistent with other evidence in this case.

. . . .

## 3. Malice Aforethought

. . . .

Other evidence presented at trial, however, weighs in favor of a finding that Henry acted with malice aforethought.

First and foremost, the court again finds credible the opinions and conclusions of the pathologist regarding strangulation as the cause of death. More importantly, the court finds credible the testimony that it likely would have taken less than [ten] seconds before Bockholt lost consciousness and at least approximately 100 seconds (one minute, forty seconds) before death, depending on the extent of any struggle. Considering the existence of two ligature marks on Bockholt's neck, Henry either choked or strangled her two separate times or essentially got a second grip on her neck during

the strangulation, perhaps initially when Bockholt was still conscious and moving. Strangling another person is clearly a wrongful act. Henry did that act intentionally in that he intentionally strangled Bockholt—it was not an accident. He would have strangled Bockholt for more than one and a half minutes after she went unconscious. The force applied as evidenced by the trauma internally and externally and amount of time such force was applied is strong evidence that Henry, at a minimum, had the general intent to do physical harm to Bockholt.

. . . .

Additionally, as has been said, malice is a term of art describing a culpable state of mind. Although the malice aforethought must exist prior to the act, the court considers Henry's actions after the strangulation in determining whether he had such culpable state of mind (malice) prior to the strangulation. In this regard, . . . . Henry placed Bockholt's body in the area where the fire was started. He left the room and then the hotel when Chaffin and Phil Bockholt arrived at the door. He then went to [the home of relatives] where he effectively attempted to hide since he did not knock on the door or identify himself to [his relatives], apparently unscrewed an outdoor light bulb, and was found "ducking" by the officer. These actions are all consistent with a guilty or culpable state of mind. They are consistent with a person intentionally doing an act with a wrongful purpose.

The court also gives consideration to other circumstantial evidence suggesting some level of ill-will or animosity existing prior to the strangulation. At the time of Henry's phone call to Bockholt from prison on January 4, there is no evidence to suggest that either Henry or Bockholt were under the influence of meth. It was a phone call, as opposed to a face-to-face meeting, and there was nothing said by Bockholt that was particularly aggressive, confrontational, or provocative. Yet, under these relatively benign conditions, Henry became angry, derogatory, and demanding toward Bockholt. Again, Bockholt still went to the hotel on the 24th voluntarily and there apparently were no incidents for several hours before the strangulation. The phone call, in and of itself, may not establish actual hatred. It is evidence, however, of how Henry could act toward Bockholt and of their potentially acrimonious relationship. It is further evidence that Henry was certainly capable of formulating malice toward Bockholt and is consistent with the finding that he similarly became angry and malicious toward Bockholt prior to strangling her.

Similarly, the court gives some consideration to the phone calls made by Bockholt to Hansen on the 24th. This evidence is not conclusive of the court's finding of malice. The court certainly recognizes that the phone calls may have been influenced in part by Bockholt's meth use. According to Hansen, however, Bockholt seemed nervous or frantic and needed to leave. Based on the

evidence, Henry was the only person with her at the time of those calls. This circumstantial evidence of the phone calls suggests that Henry at that time had already begun to act angrily or threatening toward Bockholt and may not have wanted her to leave, similar to him wanting her to pick him up from prison and her refusing, which supports the finding that he had the requisite malice prior to strangling her.

Giving consideration to all the evidence, the court finds and concludes that the State has proven beyond a reasonable doubt that Henry acted with malice aforethought.

As the trial court noted, a conviction for second-degree murder requires the State to prove Henry acted with malice aforethought.

Malice aforethought is defined as

> *a fixed purpose or design to do some physical harm to another existing prior to the act complained of*; it need not be shown to have existed for any length of time before . . . ; it is sufficient if such purpose was formed and continued to exist at the time of the injury . . . .

*State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003) (citations omitted).

"Because this element is a state of mind, circumstantial evidence is generally used to prove malice." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003). The relationship between the state of mind, malice aforethought, and the homicidal act "is more accurately characterized as a causal relationship than as a temporal relationship." *State v. Bentley*, 757 N.W.2d 257, 265 (Iowa 2008) (citation omitted). "In other words, the malice must result in the homicidal act." *Id.* Our supreme court has stated, "Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought." *Buenaventura,* 660 N.W.2d at 49.

The trial court set out in detail its findings and the inferences arising therefrom; we note especially the evidence of two ligature marks and that

strangulation would take more than one and a half minutes after the victim went unconscious supports a finding of "a fixed purpose or design to do some physical harm to another . . . before the act is committed." *See id.* The trial court's findings and inferences are fully supported by the record. Because there is substantial evidence of malice aforethought, we affirm the second-degree murder conviction.

## II. The Right to Present a Defense.

*Constitutional right to a defense.* Henry raised a defense of "meth-induced psychosis," and on appeal he asserts his constitutional right to present a complete defense was violated. Henry has failed to provide any constitutional argument or authority; we do not address this claim further.[1] *See* Iowa R. App. P. 6.903(2)(g)(3) (requiring "[a]n argument containing the appellant's contentions and the reasons for them with citation to the authoirities relied on . . . . Failure to cite authority in support of an issue may be deemed waiver of that issue.").

In any event, it is clear the district court carefully considered each of the defenses raised by Henry—intoxication, insanity, and diminished responsibility. The trial court concluded Henry's methamphetamine-induced psychosis defense "essentially as one of or the basis for the other three defenses, the diminished responsibility, intoxication, or the insanity defenses." The court stated: "It's a question of whether that then fits within or what defenses intoxication, diminished

---

[1] Henry's citation to some constitutional authority in his reply brief is not adequate to preserve the issue. *See State v. Olsen*, 794 N.W.2d 285, 287 n.1 (Iowa 2011) ("Because Olsen failed to raise this issue in his original brief, the issue is not preserved for our review."); *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770–71 (Iowa 2009) (explaining the court will not consider an issue raised for the first time in the appellant's reply brief).

responsibility, and/or insanity does that methamphetamine-induced psychosis fit."

This conclusion is in line with statutory authority.

Iowa law recognizes insanity as a complete defense to a criminal charge, so long as the defendant carries their burden:

> A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act. If the defense of insanity is raised, *the defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in relation to the act.*

Iowa Code § 701.4 (2019) (emphasis added).

Intoxication is *not* a complete defense:

> The fact that a person is under the influence of intoxicants or drugs neither excuses the person's act nor aggravates the person's guilt, but may be shown where it is relevant in proving the person's specific intent or recklessness at the time of the person's alleged criminal act or in proving any element of the public offense with which the person is charged.

*Id.* § 701.5; *see State v. Caldwell*, 385 N.W.2d 553, 557 (Iowa 1986) ("It has long been the general rule in Iowa that, although voluntary intoxication cannot constitute a defense to a crime, it may negate criminal intent if such intent is an element of the crime charged."). The trial court made no error in its statutory interpretion. *See State v. Middlekauff*, 974 N.W.2d 781, 790 (Iowa 2022) (noting review of statutory interpretation issues is for errors of law).

**III. Insanity Defense.**

Henry maintains the court erred in concluding he was unable to establish an insanity defense as a result of voluntary intoxication. He asserts his methamphetamine psychosis and psychiatric history establish he was unable to know right from wrong. We cannot agree.

A temporary mental condition caused by voluntary intoxication from alcohol or drugs does not constitute a complete insanity defense. *See State v. Hall*, 214 N.W.2d 205, 207–08 (Iowa 1974). But "[e]xtensive alcoholism or drug addiction can of course lead to a condition for which the defense of insanity might be raised." *State v. Collins*, 305 N.W.2d 434, 437 (Iowa 1981). When prolonged extensive use of a drug damages the brain and "settled or established" insanity results from such use, the insanity is treated the same as insanity from any other cause. *Id.* (citation omitted). The trial court properly applied the law.

We again set out the trial court's extensive findings, first in the context of whether Henry had the specific intent to kill.

> [T]he nature of the strangulation is also strong evidence that Henry had the time and opportunity to premeditate and had the specific intent to kill Bockholt. Again, there was no evidence of any injury to Henry or other evidence that would suggest provocation. More importantly, giving consideration to the credible testimony of Dr. Thompson, Henry would have strangled Bockholt, specifically applying consistent and continuous pressure around her neck for at least a minute and a half after Bockholt would have lost consciousness. The two different ligature marks indicate that Henry may have choked Bockholt twice or momentarily paused or regripped during this strangulation. It is reasonable to conclude that death and not just injury would be the natural consequence of physically choking or strangling Bockholt for at least approximately 100 seconds, particularly considering the fact that Bockholt likely became unconscious in less than [ten] seconds of such choking or strangling. As noted above in regard to malice, a legal inference of premeditation is not made because there was no dangerous

weapon; however, the nature and cause of Bockholt's death, in and of itself, is strong evidence that Henry strangled Bockholt with the specific intent to kill her.

The court also considers the actions taken by Henry after he strangled Bockholt. In this regard, the arson charge is addressed more specifically below. As discussed below, however, Henry started the fire in the hotel room essentially on top of Bockholt's body. He did not speak to his Aunt Jones when she called at approximately 9:20 [p.m.] He then did not allow Phil Bockholt and Chaffin inside the room and, instead, left the room and the hotel without stopping or responding to their questions about Bockholt. Henry then left the hotel and specifically went to the home of his aunt and uncle . . . . Instead of knocking on the door, ringing the doorbell, or identifying himself, Henry apparently unscrewed a lightbulb to an outdoor light at the [relatives'] home and was seen ducking by the officer. These are actions suggesting that Henry was attempting to destroy Bockholt's body/evidence of the killing and of fleeing from the crime. These actions are consistent with a finding that Henry acted willfully, deliberately, premeditatively, and with the specific intent to kill Bockholt when he strangled her. This is evidence that whatever degree or extent of Henry's methamphetamine intoxication or meth-induced psychosis existed at the time of the strangulation, it was not such a state of mind that made Henry incapable of premeditating and forming such specific intent.

In contrast or in addition to the court's analysis and findings concerning malice, however, the court also considers Henry's intoxication and diminished responsibility in addressing this premeditation element. Although characterized as defenses, Henry does not have the burden of proof. The court addresses the evidence in regard to Henry's intoxication and diminished capacity in determining whether the State proved that Henry strangled Bockholt with premeditation and the specific intent to kill her.

In this regard, the court first finds and concludes that Henry was likely experiencing and suffering some effects of methamphetamine at the time of the strangling. As discussed below in regard to the insanity defense, the court in many ways finds the testimony of Dr. [Suzette] Glasner to be credible.

Henry was likely under the influence of meth at the time of the strangulation. That meth use or intoxication then likely acted in concert with his underlying psychosis caused by the long-term use of methamphetamine. Dr. Glasner's testimony and opinions in this regard are credible. Henry likely was not thinking clearly and likely had a diminished ability to control his impulses. The question again, however, is whether that temporary condition made him incapable of premeditation or incapable of formulating the specific intent to kill Bockholt at the time of the strangulation. Intoxication of Henry does

not in and of itself negate a finding of premeditation and specific intent. . . .

First, the court notes that the exact time of death is unknown. The court believes that the more time that elapses from the time of death until the time of fire and Henry's departure from the hotel reduces the weight to be given to such post-strangulation actions. . . .

Second, the court notes that there was minimal evidence of a motive for the strangulation and, in particular, for killing Bockholt. . . .

Finally, there also was minimal, if any, evidence in regard to the activities by Henry leading up to the strangulation suggestive of any plan for such killing. . . .

The court noted:

Henry's level of meth at the time of the strangulation would have been 140-542 ng/mL, perhaps higher depending on the time of death, as opposed to the time of the fire, and the half-life of methamphetamine. This level range is approximately the same if not less than what is found with persons arrested and charged with operating while intoxicated, as argued by the State. OWI, however, does not include an element of specific intent. More importantly, based on the testimony and specifically the autopsy report, meth blood levels of 200-600 ng/mL have been reported in meth users who exhibited violent and irrational behaviors, and high levels of meth can elicit confusion and hallucinations.

The court found "Henry was experiencing the effects of methamphetamine that was likely more profound due to an underlying mental condition based on long-term meth use." The court concluded the State had failed to prove Henry strangled Bockholt premeditiatively and with the specific intent to kill.

The court then turned to Henry's insanity defense. The court again exhaustively discussed the evidence presented, including Henry's diagnosis of substance-induced psychotic disorder. The court wrote:

The question, however, is whether such condition either made Henry incapable of knowing or understanding the nature and quality of his acts or incapable of distinguishing right and wrong. Based on the evidence submitted in this matter, the court finds and concludes that Henry failed to prove by a preponderance of the evidence either

element and, thus, failed to prove that he was "insane" at the time of the crimes.

In reaching this conclusion, the court again, in many ways, finds the testimony of Dr. Glasner to be credible. In particular, Dr. Glasner conceded that it was difficult to establish a link between any psychosis (the underlying mental condition) and Henry's behavior at the time of the crimes. Although a methamphetamine-induced psychotic disorder in general can cause symptoms of hallucination, paranoia, impulsivity, and violence, Dr. Glasner could not determine with any certainty that Henry was suffering such symptoms at the time from his underlying chronic psychotic condition.

Additionally and perhaps more importantly, Dr. Glasner concluded that Henry was likely suffering from a psychological disturbance or psychosis resulting from methamphetamine "intoxication" at the time of the crimes.

Henry's own expert concluded he was likely under the influence from methamphetamine *intoxication* at the time of the crimes—not a methamphetamine-induced psychosis. And there was substantial evidence that Henry knew and appreciated the nature and quality of his acts and knew right from wrong at the time he strangled Bockholt. Considering the record as a whole, substantial evidence supports the district court's conclusion Henry failed to prove his insanity defense.

**IV. Sentence.**

Finally, Henry contends we should remand for resentencing because the court made contradictory statements about whether the sentences on his murder and arson convictions would be served concurrently or consecutively. We review sentencing decisions for correction of errors at law. *State v. Formaro,* 638 N.W.2d 720, 724 (Iowa 2002).

The court understood the question at sentencing was whether to run the fifty-year sentence, with a mandatory minimum, for second-degree murder and the

twenty-five-year sentence for arson concurrently or consecutively. Before the statement on which Henry relies,[2] the court ordered "these two sentences be run consecutive to each other for one indeterminate term not to exceed [seventy-five] years with that [thirty-five]-year mandatory minimum term." The court explained "this sentence provides the maximum opportunity for rehabilitation of Mr. Henry. More importantly, the court finds that this sentence protects the community against further offenses." The court noted there were "two separate crimes, separate offenses" with the arson occurring after the murder. The court has also considered the violent nature and circumstances of those two offenses, Henry's prior criminal history, his prior opportunities for "rehabilitative services in regard to those mental health issues and substance issues, both within the community and within the prison system during prior probations, prior parole, work releases," and Henry's unwillingness or inability to take advantage of those rehabilitative services. The court ruled, "And for all of those reasons, the court does believe that consecutive sentences are appropriate." And the filed judgment and sentence clearly states the "sentence(s) of incarceration will run **consecutive** to each other for one indeterminate term not to exceed [seventy-five] years."

Because the sentencing court clearly intended to impose consecutive sentences, we affirm.

**AFFIRMED.**

---

[2] "[T]he court believes that concurrent sentences are appropriate in this case." In light of the court's reasoning, this is clearly a misstatement by the court.