# IN THE COURT OF APPEALS OF IOWA

No. 23-0912
Filed September 18, 2024

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**JAMES SHILOH KLEVER,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


　　　A defendant challenges whether sufficient evidence supports his conviction for murder in the first degree. **AFFIRMED.**


　　　Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

　　　Brenna Bird, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee.


　　　Considered by Schumacher, P.J., Sandy, J., and Vogel, S.J.*

　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**VOGEL, Senior Judge.**

James Klever was convicted of first-degree murder after beating and killing a woman during a drug-fueled altercation. He appeals this conviction, alleging the State failed to prove he specifically intended to kill the victim or that he acted with malice aforethought. Viewing the evidence in the light most favorable to the State, substantial evidence supports the verdict. We therefore affirm.

## I. Factual Background and Proceedings.

Klever met Rachel Reuter in spring of 2021. Both Klever and Reuter struggled with substance use and regularly used methamphetamine together. The two soon became romantically involved.

Initially, Reuter was living at The Beacon, a transitional home for women. In early June 2021, Reuter was discharged after leaving the home without permission too many times. On June 11, after her discharge, she went to a motel in Urbandale, where she met up with Klever and stored her belongings in his car.

The next night, Klever and Reuter needed a place to stay. They texted Klever's friend, Pam Larson, asking if they could stay with her—Larson often opened her garage to Klever and others for drug use. This time Larson declined— she and her son were leaving for a vacation the next morning—but Klever and Reuter snuck into her garage anyway.

Klever and Reuter used methamphetamine together in Larson's garage into the early morning. The two then started fighting, and the physical altercation escalated. Soon Klever ran into the house and woke up Larson. Klever told her Reuter "had gone crazy." Larson went out on the back deck and heard "banging

noises" coming from the garage. She told Klever to "take care of it," then locked the door and went back to sleep.

As Klever described it to the jury, he then went back into the garage and the fighting resumed. He claimed Reuter hit him "across the back" with a baseball bat and tried to swing at his head. He then grabbed the bat from Reuter, "swung and hit her inside the head with it." Reuter "didn't get up," and Klever "couldn't believe" what he had done.

Klever then called Larson's phone and told her that Reuter "wasn't breathing anymore." Larson told Klever to call an ambulance, but neither he nor Larson did. Instead, Larson left for her vacation and Klever began covering up Reuter's death.

Klever wrapped Reuter's body in a motorcycle tarp and placed her body in the trunk of his car. He drove to a friend's house and continued using methamphetamine, leaving Reuter's body in the trunk in the June heat. He stayed there for nearly three days, only leaving after he feared involving his friend. Klever drove around for a while, eventually stopping on a bridge over the Grand River. He then removed Reuter's decomposing body from his trunk, told her he was "sorry," and "slid her" into the water. The next day, Klever took a bag containing Reuter's belongings out to a gravel road, dumped gasoline on it, and lit it on fire.

Over the next few days, Klever stayed with several other people and told them a different story than what he told the jury. First, he asked to hide his car at Cally Stanton's house. While there, he told Stanton that he "hit" Reuter, and "kept hitting her and he kept hitting her until he couldn't hit her anymore because of his hand." Then he took a baseball bat and "he hit her again and again."

Next, he went to his son Colby's house—arriving without warning and telling his son he "did something bad." Colby observed that Klever's hand was "busted up pretty good" and swollen "like a balloon." Klever stayed with his son for three days, and on the third day began telling an "out there" story about a "witch and her son." Colby shrugged off the witch story, but then Klever said that he "killed somebody." Klever told Colby he believed Reuter was an informant—noting several occasions when he had been caught with drugs after being in her presence—and so he "had to take care of her." He explained to Colby that he got Reuter "in an enclosed area" and "started beating her for being an informant," ultimately taking a baseball bat and beating her to death. Klever also relayed that at one point he believed she was dead but began making noise again, so he hit her with "the butt of [a] knife."

After speaking with Colby, Klever then met up with Larson, who was back from vacation. Larson had found a bloody baseball bag in her garage upon her return, so she asked Klever what happened. Klever described beating Reuter until she passed out, waiting for her to wake up, and then beating her again until she was dead.

Finally, Klever went to his daughter Jaimy's house. Jaimy similarly observed Klever's "shattered" hand. When Jaimy asked what caused the injury, Klever said he "smashed it on someone's skull," and that he had "killed a guy and a girl." Jaimy believed Klever was under the influence and did not credit the story.

Meanwhile, Reuter's father had contacted local police to report his missing daughter. Investigating officers eventually zeroed in on Klever after reviewing motel security footage and receiving reports of a burn pile that contained burned

items, including a piece of mail with Klever's name on it and several of Reuter's belongings.

Klever was charged with first-degree murder under Iowa Code section 707.2(1)(a) (2021).  After a seven-day trial, the jury found Klever guilty as charged.  Klever was sentenced to life in prison.  Klever now appeals, disputing whether the State proved he specifically intended to kill Reuter or that he acted with malice aforethought.

## II.  Analysis.

We review challenges to the sufficiency of evidence for correction of errors at law.  *State v. Schwartz*, 7 N.W.3d 756, 763 (Iowa 2024).  "The jury's findings of guilt are binding on appeal if the findings are supported by substantial evidence." *State v. Leckington*, 713 N.W.2d 209, 213 (Iowa 2006).  "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt."  *Schwartz*, 7 N.W.3d at 763 (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)).  Across our review, we consider the evidence "in the light most favorable to the State, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence."  *Id.* (cleaned up).

To convict Klever of first-degree murder, the State had to prove: (1) Klever "beat/bludgeoned" Reuter; (2) Reuter "died as a result of" Klever's actions; (3) Klever "acted with malice aforethought"; and (4) Klever "acted willfully, deliberately, premeditatedly and with specific intent to kill" Reuter.  *See State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020) ("Jury instructions, when not objected to, become the law of the case for purposes of appellate review for

sufficiency-of-evidence claims."); *see also* Iowa Code §§ 707.1, 707.2. Because Klever does not dispute that he beat/bludgeoned Reuter and that she died as a result of his actions, we focus on whether substantial evidence supports the final two elements.

The jury was instructed that "specific intent" means "not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind." *See, e.g.*, *State v. Benson*, 919 N.W.2d 237, 247 (Iowa 2018). The instructions also clarified that specific intent "is seldom capable of direct proof," and may instead be found by considering "the facts and circumstances surrounding the act." *See, e.g.*, *id.* at 243–44.

Klever argues the evidence at trial shows he was merely "reacting" to Reuter's "methamphetamine induced rage." As Klever sees it, the only two witnesses at the scene—Klever and Larson—both observed Reuter in a combative state, which shows Klever was responding to her aggression rather than intending to kill her. Yet the jury could reject Klever's narrow view of the evidence.

Klever repeated the same core facts of his crime to multiple people—he beat Reuter until she was unconscious, beat her again when she awoke, and ultimately beat her with a baseball bat, which killed her. The jury could credit the testimonies of Stanton, Colby, and Larson and conclude the circumstances of Klever's actions—a course of violent conduct that escalated until Reuter was not just unconscious, but dead—showed he specifically intended to kill her.

Klever urges us to discount Colby's testimony as not credible and disregard Klever's relayed statements as the "ramblings of a man under the heavy influence of methamphetamine." Yet these are precisely the kind of determinations that are

reserved for the jury. *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (explaining "[t]he jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive," and "the very function of the jury is to sort out the evidence and 'place credibility where it belongs'" (citation omitted)). Thus, there is substantial evidence to support the jury's finding that Klever specifically intended to kill Reuter.

We likewise find that substantial evidence shows Klever acted with malice aforethought. "[A] person acts with malice aforethought if the person has a state of mind prompting the person to take the life of another intentionally, without legal justification or excuse." *State v. Green*, 896 N.W.2d 770, 779 (Iowa 2017). Locating a person's state of mind requires inferences, and juries "may infer malice from the use of a dangerous weapon." *Id.* at 780. A baseball bat is a dangerous weapon. *See id.* at 781 ("Malice aforethought is inferred simply from the use of the dangerous weapon, and the manner that [the defendant] used the bat in this case—to cause death to another—supports the inference of malice aforethought."). As well, malice aforethought need not "exist for any particular length of time." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003).

Here, Klever began by beating Reuter with his fists and then intensified his attack by choosing to use a baseball bat. Though Klever asserts he only used the bat after Reuter hit him with it first, the jury heard conflicting testimony on this point—a witness who observed Klever shortly after the murder saw no bruising or any other injuries indicating Klever was struck by a bat. What's more, Klever did not raise self-defense or intoxication as affirmative defenses. Accordingly, substantial evidence supports a finding that Klever acted with malice aforethought

when he chose to beat Reuter with a dangerous weapon, causing her death.  We therefore affirm Klever's conviction for first-degree murder.

**AFFIRMED.**