# IN THE COURT OF APPEALS OF IOWA

No. 24-1712
Filed October 1, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**SCOTT DAVID SWARTZ,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Marshall County, John J. Haney,

Judge.


        A defendant appeals his convictions and sentences on four offenses.

**AFFIRMED.**



        Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant

Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and David Banta, Assistant Attorney

General, for appellee.


        Considered without oral argument by Schumacher, P.J., and Badding and

Langholz, JJ.

**SCHUMACHER, Presiding Judge.**

Scott Swartz appeals the following issues: (1) a finding that Swartz was not legally insane at the time of the offenses; (2) a finding that Swartz acted with malice aforethought; and (3) the imposition of consecutive sentences.

We affirm the determinations of the district court regarding an absence of insanity as well as the presence of malice aforethought. And we find no abuse of discretion concerning the decision to impose consecutive sentences for separate offenses. Accordingly, we affirm.

## I.    Background Facts & Proceedings

Marshalltown law enforcement received a mid-afternoon call from Vicki Gunter, who is Swartz's mother and the victim's ex-wife. The victim, Paul, was Swartz's father.[1] Vicki reported that Swartz told her over the phone that his dad had been on the ground for a couple of hours. Vicki "knew immediately that something wasn't right" because Swartz's "words were very erratic and irrational and bizarre." Swartz, in his late forties, had been living with his father. The phone call between Swartz and his mother lasted for about forty-five minutes. Vicki also stated that Swartz had been released from Allen Memorial Hospital recently and Swartz told her there was a loaded shotgun in the house. Vicki later testified that she called law enforcement because she was concerned about Swartz's statements, including that Paul had fallen down some stairs and tripped on a gun case.

---

[1] The appellant and his father share a surname. So, for purpose of this opinion we refer to the parents by their first names and the appellant by his surname.

Based on Vicki's call, law enforcement was dispatched to Paul's home to perform a welfare check. Swartz voluntarily allowed two officers to enter. As Swartz was guiding one of the officers inside, he stated, "He's been laying there since 11:30. He's a piece of shit. He's Saul. He's garbage. He's one demented fuck." Paul was found lying on the bathroom floor covered in blood, using his finger to point toward his face and then at Swartz. No one else was found within the residence.

One officer directed Swartz away from Paul. While requesting that Swartz sit on a couch, Swartz complained to law enforcement about Paul's television preferences, ". . . every day, its fucking death . . . ." Before sitting down, Swartz gestured toward a shotgun on the couch, grabbed it, and stated, "this is what I found . . . I lost it at the pawn shop, he tracked it, the shell fell out of it, its fully loaded . . . ." The officer tried to unload the gun, found a shell jammed in the chamber that he could not remove, and placed it on the kitchen table. Another officer disassembled the gun but still could not remove the jammed shell. Swartz was then searched, and another shotgun shell and Paul's inhaler were found in his pocket.

Swartz, when speaking to the officers, stated he shoved Paul twice. He also stated that Paul "ran into the door" and "crawled back into the bathroom" and had been lying in the bathroom since 11:30 a.m. Swartz went on to describe the phone conversation with Vicki where she said he should help Paul, and Swartz had hung up on her, stating to officers "[T]hat's the stupidest shit you can say . . . ." Swartz rambled continuously while in the residence, in the law enforcement vehicle, and while at the police station.

Although Swartz had blood on his shoes and pant leg, he had no observable injuries and stated to law enforcement that he had no injuries. Swartz cooperated with law enforcement at the residence. He was handcuffed, walked out to a law enforcement vehicle, and transported to the police station.

During the transport, Swartz continued to talk. Video evidence from within the vehicle showed him referring to Paul in a negative manner: "he's so fucking sick"; "he's not even worth saving"; "you guys are gonna actually try to save that fucking piece of shit, there's nothing fucking wrong with him, oh my god, and you're gonna fucking rescue him, fuck I'll come back and kill him myself, it took fucking two shoves"; "he's trash." The subject of his rambling then turned to his mother, stating, "my mom obviously called you guys, she's the only one that could have"; "my fucking mom's garbage." He continued, "I've been awake since 5 o'clock in the morning, woke up to seven hours of epiphanies"; "I only shoved him twice, there's no reason why he can't get up, he hit the ground by the stairs, and crawled back into the bathroom, it's the biggest stain in there, I cleaned it three times, that's how he wants to be remembered."

After arriving at the police station, Swartz stated that he "used a gram, but still wasn't feeling anything from it." A detective attempted to interview Swartz later, who was uncooperative, and after the detective left the room, Swartz upended a table and damaged a telephone.

Back at the residence, another law enforcement officer waited with Paul until paramedics arrived. Paul was then transported to Unity Point Hospital, where photographs of his injuries were taken. He was later transferred to University of Iowa Hospital. Paul's injuries included extensive bruising on his arms, torso, and

head, a fractured femur, a laceration on his scalp, fractured facial bones, blood in the chest cavity, and a fractured rib. Paul subsequently died while at University of Iowa Hospital. An autopsy was performed revealing the extent of his injuries. The forensic pathologist who completed the autopsy testified that while the injuries may not have been independently fatal, they might, together, "produce enough physiologic stress, enough stress on [his] body, that results in death, particularly when there are other underlying medical conditions at play." Paul had heart disease, high blood pressure, hypertension, coronary artery atherosclerosis, renal disease, and pulmonary emphysema.

Officers had noticed extensive property damage within the residence including a fan that was knocked over in Paul's bedroom, a hole in the drywall immediately outside Paul's bedroom, a broken picture frame on the floor, and damage to Paul's bedroom door and frame. The strike plate and screws to Paul's bedroom door latch were lying on the floor. There were copious amounts of blood within the bathroom where Paul was located.

After obtaining a warrant to search the home, detectives seized evidence from Swartz's bedroom including a plastic bag with a crystalline substance in it, straws with white residue, and a glass pipe. The shotgun that Swartz showed to the initial responders was seized and sent for DNA testing, as law enforcement noticed a red substance on the stock of the gun. Buccal swabs were then taken pursuant to a warrant from Swartz and Paul's autopsy, which were later submitted for analysis.

The crystalline substance recovered from Swartz's bedroom tested positive for methamphetamine. The criminalist who performed testing on the red

substance located on the stock of the shotgun determined it matched Paul's DNA profile. The "rough areas" of the gun were swabbed and tested and also tested for touch-transfer DNA. The results showed a mixture of three people, with the "major contributor" being Swartz.

Swartz was charged via amended and substituted trial information with first-degree murder, in violation of Iowa Code sections 707.2(1)(a) and 707.1 (2023); prohibited person in possession of a firearm, in violation of sections 724.26, 902.8, and 902.9(1)(c); prohibited person in possession of ammunition, in violation of sections 724.26, 902.8, and 902.9(1)(c); possession of a controlled substance, second offense, in violation of sections 124.206 and 124.401(5); and fourth-degree criminal mischief, in violation of sections 716.1, 716.2, and 716.6. Swartz entered a plea of not guilty to all these charges.

Swartz waived his right to a jury trial and filed a notice of intent to rely on defenses of insanity or diminished capacity. Following a bench trial, Swartz was convicted of second-degree murder, prohibited person in possession of a firearm, prohibited person in possession of ammunition, and possession of a controlled substance.[2]

The district court sentenced Swartz on the murder conviction to fifty years of incarceration, with a seventy-percent mandatory minimum. As to both the prohibited-persons convictions, Swartz received sentences of fifteen years of incarceration, with three-year mandatory minimums. And for the possession-of-a-controlled-substance conviction, he was sentenced to two years of incarceration.

---

[2] Swartz was convicted as a habitual offender on the possession of a firearm and ammunition charges.

The sentences were ordered to be served consecutively for a total of eighty-two years, subject to mandatory applicable minimums.

## II.     Discussion

### a.  Insanity Defense

Swartz asserts the trial court's rejection of his insanity defense was in error. The court held Swartz failed to prove "by preponderance of evidence that he met the necessary elements to establish the complete defense of insanity."  But the court found that Swartz "was unable to form the specific intent . . . required by law due to his diminished capacity" based on his ingestion of methamphetamine before he attacked Paul.  Swartz disputes the insanity determination, arguing there was substantial evidence demonstrating his insanity because of expert testimony concluding he was insane during the incident.

The trial court employed Uniform Jury Instruction 700.1 to determine whether Swartz was guilty of murder in the first-degree:

> 1. On or about January 7, 2023, the Defendant struck [Paul].
> 2. [Paul] died as a result of being struck.
> 3. The Defendant acted with malice aforethought.
> 4. The Defendant acted willfully, deliberately, premeditatedly, and with specific intent to kill [Paul].
> 5. These events occurred in the County of Marshall in the State of Iowa.

We review challenges to the sufficiency of the evidence "for correction of errors at law and will uphold the [factfinder]'s verdict if it is supported by substantial evidence."  *State v. Kieffer*, 17 N.W.3d 651, 655 (Iowa 2025).  Evidence is considered substantial if it is sufficient to "convince a rational fact finder the defendant is guilty beyond a reasonable doubt."  *Id.* (quoting *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022)).  "[W]e view the evidence 'in the light most

favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *Id.* (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)).

Iowa Code section 701.4 defines the defense of insanity in criminal cases:

> A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act. If the defense of insanity is raised, the defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in relation to the act.

The State and Swartz presented competing expert testimony regarding whether Swartz was insane before, during, or after the incident with his father. The defense expert, Dr. Rosell, testified that Swartz experienced psychosis independent of drug use, and his behavior on the day of the incident indicated psychosis, which showed Swartz was unable to distinguish between right and wrong. Dr. Rosell also testified that Swartz was diagnosed with schizophrenia in 2012.

Dr. Jones-Thurman first testified that Swartz's schizophrenia diagnosis was incorrect, as the diagnosis came later in his life, which is abnormal. Dr. Jones-Thurman instead diagnosed Swartz with antisocial personality disorder and unspecified mood disorder, and he attributed Swartz's behavior on the day of the incident to drug-induced psychosis. But when Dr. Jones-Thurman was confronted with cross-examination as to whether she properly diagnosed Swartz with

antisocial personality disorder because he did not show symptoms before age fifteen, she admitted there was not any evidence of early onset symptoms, which was a nondiscretionary criterion for the diagnosis.

The trial court concluded that Swartz did not prove a defense of insanity. The district court also found Swartz was unable to form specific intent required for first-degree murder as he suffered from diminished capacity due to drug use and therefore was guilty of second-degree murder.

Swartz argues Dr. Jones-Thurman provided an opinion which was "so impossible, absurd, and self-contradictory that the court should [have] deem[ed] it a nullity." *See State v. Cahill*, 972 N.W.2d 19, 33 (Iowa 2022) (citation omitted). When there is conflicting testimony regarding insanity, "the issue of sanity is clearly for the fact finder to decide." *State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000); *State v. Stowe*, No. 21-0080, 2022 WL 2826025, at *3 (Iowa Ct. App. July 20, 2022). "The trial court as trier of fact is not obligated to accept opinion evidence, even from experts, as conclusive." *Jacobs*, 607 N.W.2d at 685. When the trial court must make determinations based upon "a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses." *Id.* While we afford the trial court deference in expert opinion credibility determinations, the testimony "should not be arbitrarily and capriciously rejected." *Stowe*, 2022 WL 2826025, at *1 (citation omitted).

Here, the trial court found that each expert provided credible reasons for their differing opinions. The court did not determine that Dr. Jones-Thurman's antisocial personality diagnosis contradiction during cross-examination "stole very

much from [the witness's] professionalism and credibility." The court's conclusion that Swartz was sane at the time of the incident but suffered from diminished capacity "is supported by the State's expert's testimony and additional evidence supporting the expert's conclusions." See State v. Belk, No. 21-1742, 2022 WL 10861390, at *2 (Iowa Ct. App. Oct. 19, 2022).

As the district court found, the supporting evidence includes the fact that Swartz's mental condition stabilized "when he was treated at Allen Hospital prior to this incident, as well as after he was taken into custody and stabilized at Marshall County Jail." We agree with the district court's assessment that the evidence showed Swartz's condition improved "when he return[ed] to being treated for his underlying mental health condition(s) and [did] not have access to illegal drugs." See id. at *3. The court found that Swartz "undisputedly suffered from long-standing cannabis and amphetamine disorders, and these disorders have impacted his underlying mental health condition[s]."

Although Swartz indeed suffers from underlying mental-health conditions, they "do[] not meet the definition of insanity under Iowa law." The court determined that when these conditions are untreated and combined with methamphetamine usage, Swartz has a lessened ability to form specific intent. The court found Swartz possessed diminished responsibility due to his methamphetamine usage on or immediately before the incident. See State v. Hall, 214 N.W.2d 205, 207 (Iowa 1974) (noting temporary mental conditions caused by voluntary intoxication "do[] not constitute a complete defense").

Viewing the evidence in light favorable to the State, and applying deference to the trial court's factual determinations, we find sufficient evidence supports that

Swartz failed to prove he was insane before, during, or after the incident. *See Kieffer*, 17 N.W.3d at 655; *Belk*, 2022 WL 10861390, at *3.

### b. Malice Aforethought

Swartz asserts there was insufficient evidence showing he possessed malice aforethought as required for a conviction of second-degree murder as it is speculative that Swartz used the shotgun to inflict blunt-force injuries and that his statements indicating malice were the product of a muddled mind. *See* Iowa Code § 707.1. We review sufficiency-of-the-evidence challenges for correction of errors at law. *Kieffer*, 17 N.W.3d at 655.

Malice aforethought is a phrase "used to describe a culpable state of mind, an essential element of the offense of murder that the state must prove . . . beyond a reasonable doubt." *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017). Malice is a state of mind "which prompts one to do a wrongful act intentionally, without legal justification or excuse." *Id.* at 779 (citation omitted). "Malice aforethought may accompany an unlawful intent to kill, or may simply be an unlawful intent 'to do physical harm to another' that results in death." *Id.* (quoting *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002)). This state of mind applies both to "a specific intent to kill or . . . the general intent to do physical harm . . . ." *Id.* A factfinder may infer malice aforethought because of employment of a dangerous weapon. *Id.* at 780. A "dangerous weapon" is statutorily defined as

> any instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed, except a bow and arrow when possessed and used for hunting or any other lawful purpose. Additionally, any instrument or device of any sort whatsoever which is actually used in such a manner as to indicate that the defendant intends to inflict

death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon. Dangerous weapons include but are not limited to any offensive weapon, pistol, revolver, or other firearm, dagger, razor, stiletto, switchblade knife, knife having a blade exceeding five inches in length, or any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person.

Iowa Code § 702.7. This inference exists because a rational factfinder "could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill." *Green*, 896 N.W.2d at 780. A dangerous weapon can include "almost any instrumentality under certain circumstances." *State v. Ortiz*, 789 N.W.2d 761, 767 (Iowa 2010) (citation omitted).

Here, the trial court concluded that Swartz struck his father with the stock of the shotgun, implicating the dangerous weapon inference. Swartz argues the "dangerous weapon inference is inapplicable because it is sheer speculation to conclude Swartz struck Paul with the shotgun, and . . . it is speculation to conclude Swartz intended death or grievous bodily harm by doing so."

Contrary to Swartz's claim, the evidence shows that Paul's DNA profile was present within the blood found on the stock. Also, DNA testing on the "rough areas," where a person would normally hold the shotgun, showed Swartz as the primary contributor of DNA among two other profiles. A factfinder could reasonably infer that the DNA evidence demonstrates that Swartz held the shotgun and hit his father with the stock, causing blunt-force injuries. *See State v. Walden*, No. 18-0209, 2019 WL 6358300, at *8 (Iowa Ct. App. Nov. 27, 2019).

Swartz also asserts that even if he struck his father with the stock of the shotgun, the usage was not within the statutory definition because it was "not used

in the manner for which it was designed." *See* Iowa Code § 702.7. Swartz's argument is that using a "rubber-capped butt of the shotgun" to hit someone does not indicate malice because it is not foreseeable that death or bodily harm could arise from using the gun in that manner. *See Green*, 896 N.W.2d at 780. But this argument ignores the statute's text, which states "any instrument or device . . . which is actually used in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon." Iowa Code § 702.7.

A reasonable factfinder could, based on DNA evidence, infer that Swartz used the shotgun to strike his father with the intention to inflict death or serious injury, demonstrating malice aforethought. *See Walden*, 2019 WL 6358300, at *8; *see also State v. Linderman*, 958 N.W.2d 211, 222 (Iowa Ct. App. 2021) (observing a severe beating can serve as an inference of malice aforethought).

Swartz further asserts that because of his diminished capacity, the trial court erred in finding malice through the statements he made regarding his father. "Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003); *accord State v. Thompson*, 982 N.W.2d 116, 122 (Iowa 2022). Malice aforethought need not exist "for any particular length of time." *Buenaventura*, 660 N.W.2d at 49 (citation omitted). "The State may show premeditation 'by the nature of the crime and the defendant's actions afterwards.'" *State v. Tate*, No. 11-1671, 2013 WL 261248, at *5 (Iowa Ct. App. Jan. 24, 2013) (quoting *Buenaventura*, 660 N.W.2d at 49).

Here, there is ample evidence of bad animosity between Swartz and his father, which supports the finding of malice. *See Thompson*, 982 N.W.2d at 122 (providing examples of strained relationships in connection with malice inferences). The evidence demonstrates Swartz's ill feelings towards his father. Swartz made statements including that the police should not bother to save his father, that Swartz would "kill him off," and referred to his father repeatedly as a "piece of shit," "trash," and "demented."

And the evidence shows Swartz left his father struggling and injured on the bathroom floor for upwards of four hours without calling for help before law enforcement arrived at the prompting of Vicki. A reasonable factfinder could infer the existence of malice through Swartz's statements and actions after the incident. *See Buenaventura*, 660 N.W.2d at 49.

We find the trial court did not err in determining the existence of malice aforethought due to substantial evidence showing Swartz used a dangerous weapon and possessed ill will toward his father.

### c. Sentencing

Swartz asserts the trial court abused its sentencing discretion by ordering all the sentences to run consecutively based on the nature of one offense and the separate nature of the other offenses.

We review challenges to sentencing for abuse of discretion. *State v. West Vangen*, 975 N.W.2d 344, 355 (Iowa 2022). "A court abuses its discretion when it relies on impermissible factors to sentence a defendant." *Id.* Sentencing decisions by a trial court "to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor . . . ." *State v. Formaro*, 638 N.W.2d 720,

724 (Iowa 2002). "An abuse of discretion will not be found unless we are able to discern that the decision was exercised on grounds or for reasons that were clearly untenable or unreasonable." *Id.*

Swartz claims that the trial court abused its sentencing discretion for two reasons; first, that the court should not have imposed consecutive sentences for each count because they are separate and distinct within themselves, and second, that the nature of one offense is not a valid reason to impose consecutive sentences on the other offenses.

Iowa Code section 901.8 allows a sentencing judge to impose consecutive sentences if there are two or more separate offenses, even if the "offenses were committed in the course of a single transaction." *State v. Criswell*, 242 N.W.2d 259, 260–61 (Iowa 1976) (citation omitted); *accord State v. Olson*, No. 22-1305, 2023 WL 5092217, at *3 (Iowa Ct. App. Aug. 9, 2023). Sentencing courts are required to "explicitly state the reasons for imposing a consecutive sentence, although in doing so the court may rely on the same reasons for imposing a sentence of incarceration." *State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016).

The trial court's sentencing order states the reasons for the imposition of consecutive sentences: "the separate, serious nature of murder in Count I; Defendant's marked lack of remorse; the Defendant's extensive criminal history which includes prior convictions for violent behavior and controlled substance violations; and the separate and distinct nature of each of these offenses."

Because the sentencing court stated its reasoning for imposing consecutive sentences based on appropriate factors, we affirm.

**III.**     **Conclusion**

For the above reasons, we affirm.

**AFFIRMED.**